UNITED STATES of America

v.

Hanna GORAYSKA, Danuta Bebnowska,
Zygmunt Sarkowicz, Grazyna Sobota,
and Maria Goszler, Defendants.

No. S 79 Cr. 733.

United States District Court,
S. D. New York.

Dec. 17, 1979.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City (Charles M. Carberry, Asst. U. S. Atty., New York City, of counsel), for the United States.

Fine & Stieglitz, New York City (Charles J. Fine, New York City, of counsel), for defendant Sobota.

Daniel Riesel, New York City, for defendant Gorayska.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motion by defendant Grazyna Sobota to suppress a social security card in the name of Stanislawa Sobota, seized from her apartment on May 30, 1979, is granted.

Defendant's motion, to suppress statements made by her on May 30, 1979, is denied.

## FACTS

This Court conducted a hearing on defendant's motions on November 28, 1979.[1] The Government stipulated that certain documents were seized from defendant Sobota on May 30, 1979, and further stipulated that on the same day a signed statement was taken from her while she was under administrative arrest at the offices of the United States Immigration and Naturalization Services ["INS"], located at 26 Federal Plaza, New York City. The burden of proof, therefore, shifted to the Government to justify the seizures and the taking of the statement at the INS offices.

Three INS criminal investigators, a special agent with the Department of Health, Education and Welfare ["HEW"], and an INS interpreter testified for the Government. What follows is their collective ver-

---

1. The Court ruled that defendant Gorayska lacked standing, and therefore could not participate in the motions to suppress.

sion of the seizure of evidence and the defendant's arrest on May 30, 1979.

On May 23, 1979, during an interview with three undocumented aliens,[2] INS Agent Kiernan and HEW Agent Lane learned that the defendant furnished social security cards to undocumented aliens from Poland, to facilitate their illegally obtaining employment in this country. Between May 23 and May 30, the agents made no attempt to secure either a search or an arrest warrant.

On May 30, 1979, at approximately 7:30 a. m., Agents Kiernan and Lane went to the defendant's apartment at 78 North 7th Street, Brooklyn, New York, in an attempt to locate and apprehend the defendant as an undocumented alien. The agents observed the defendant leaving the apartment, and stopped her on the street. The defendant acknowledged that she was Stella Sobota, and that she had entered this country with a tourist visa and was employed at the Richard Schmidt Company in Manhattan. When the agents asked to see her passport, she indicated that it was back in her apartment, to which they then proceeded. The agents testified that defendant let them into her apartment where they found the defendant's brother, Wieslaw Sobota, in the kitchen. Since Wieslaw did not speak English, the agents questioned him with the aid of the defendant, who acted as an interpreter.

After briefly questioning Wieslaw about his immigration status, Agent Kiernan again asked to see defendant's passport. Defendant led him to a small room off the kitchen and began looking into a dresser drawer. When Agent Kiernan moved closer to look into the drawer, the defendant slammed it shut. The agent then reopened the drawer to see what she was trying to conceal, and removed stacks of letters. The agent continued to open other drawers, which the defendant indicated she wished to open, and removed more documents, but

he did not find the passport. Furthermore, Agent Kiernan looked under beds and in closets for other undocumented aliens. The search lasted approximately one-half hour. Defendant then advised him that her passport was at the Polish Consulate. Agent Kiernan then asked the defendant for any identification, and the defendant produced a social security card in the name of Grazyna Sobota.

Both Agents Kiernan and Lane testified that a second social security card in the name of Stanislawa Sobota, the defendant's mother, was seized on May 30, but neither could recall where or when it was found. Agent Kiernan speculated that the card was probably found among the letters that were seized, or in a later search of the defendant's pocketbook. After the search was concluded, both the defendant and her brother were placed under arrest and taken to the INS office at 26 Federal Plaza, where they were then separated.

Defendant's interrogation began at approximately 9:00 a. m. and ended by 1:00 p. m., at which time the defendant was free to leave. Initially, Agent Lane, an INS interpreter and INS Agents Simon and Henderson were present in the interview room. The interpreter read the defendant her rights in Polish, and the defendant read and signed a waiver of rights form which had been translated into Polish. When the questioning began, the defendant began answering in English. The defendant did not ask for an attorney or seek to stop the questioning at any time. After a few minutes, the interpreter went to the next room where the defendant's brother was being interrogated. Defendant never requested the aid of the interpreter although one was available in the adjoining room. Agent Lane left the room approximately an hour later.

Defendant's interrogation was conducted in English, primarily by Agents Simon and Henderson. After the defendant was ad-

---

**2.** The Court chooses the term "undocumented" in place of the more common designation "illegal" to refer to aliens in the United States without the necessary documents. The Court feels that the term "illegal aliens" places an unjustified stigma upon the individual so labeled, and also assumes the conclusion that the alien is illegally in this country.

vised of her rights, she was informed that she was subject to deportation proceedings since she had violated the conditions of her visa by obtaining employment. The agents also informed her that they were conducting a criminal investigation of a scheme to provide social security cards to undocumented aliens. The agents advised the defendant that they wanted her to cooperate, and that in the event she supplied certain information, she would be able to remain in the United States with authorization to work for the period of time required to complete the investigation. Transcript of Suppression Hearing at 124, *United States v. Sobota*, 79 Cr. 733 (Nov. 28, 1979) [hereinafter cited as "Tr."].

The agents told the defendant that they had three options. They said that if she refused to cooperate by supplying useful information, they could recommend that she be detained, in which case her deportation hearing would be held immediately. Alternatively, they could recommend that she be released on a bond, in which case her deportation hearing would be held in approximately two weeks, depending on the condition of the INS docket. The agents then posed a third option. They told the defendant that if she cooperated she would be released on her own recognizance, given an authorization to work, and that the INS would issue an order to show cause why she should not be deported returnable in 60 days, at which time that return date could be extended by the INS until the completion of the criminal investigation. The agents told the defendant that they would have no part in the determination of whether she would eventually be deported or given a voluntary departure, and that an immigration judge would have to make that decision.

Upon hearing these options, the defendant indicated that she wished to remain in the United States and would cooperate. She was then questioned concerning her immigration status and her knowledge of those involved in the alleged social security fraud. Agent Simon prepared an affidavit during the questioning which consisted of a summary of the defendant's answers. The questioning lasted approximately two hours. The period does not include two breaks,[3] the time it took to read the written statement to her, or the period when she was fingerprinted and photographed. The defendant indicated she understood the affidavit; she initialed corrections and signed the last page. Tr. at 91. The defendant also prepared a list of names of aliens with tourist visas who were working in this country.

At the conclusion of the interview, the agents gave the defendant an order to show cause returnable in 60 days, a new social security card with her name and old social security number, a written authorization to work, and an INS telephone number which she was to call each week to report any change in her employment or address, or any additional information she might have. The agents told her not to discuss the investigation, but said that she could use the order to show cause to explain why she had been at the INS office.

The defendant and her brother[4] described the encounter quite differently. The defendant testified that she was stopped outside her apartment by Agents Kiernan and Lane. Agent Kiernan identified himself as an INS agent. He asked her about her status in this country and whether she lived alone. She said she lived alone, and at that point Agent Kiernan began screaming "Don't lie to us," and forced the defendant

3. The defendant was given a cup of coffee during a coffee break, and later was allowed to call her employer.

4. The defendant's testimony was substantially supported by the testimony of her brother. The Court questions his credibility, however, since he corroborated with uncanny precision the testimony given by the defendant concerning certain statements made by the agents

while in her apartment. Given his inability to understand English, it is unlikely that he could have known what the agents said without the help of his sister. *See* Tr. at 153–54. Furthermore, during the suppression hearing, it was necessary for the Court to instruct the defendant to stop signalling to her brother while he was testifying. Tr. at 145–46.

to take them to her apartment. When the defendant's brother opened the door slightly, Kiernan pushed the door and her brother against the wall, and proceeded into the apartment. According to the defendant, it was not until they reached the apartment and the agents had questioned her brother that Agent Kiernan asked to see her passport and social security card. At that time, the defendant told him that her passport was at the Polish Consulate, but began to look through a dresser drawer to find her social security card. The defendant testified that Agent Kiernan was searching everywhere in her apartment for the social security card. Finally, the defendant found the social security card in the name of Stanislawa Sobota and gave it to Kiernan, who demanded to see her second social security card. About fifteen minutes later, the defendant found and gave the social security card in the name of Grazyna Sobota to Kiernan. Kiernan continued searching for some time after that and then placed the defendant and her brother under arrest. Defendant testified that she was very "afraid" of Agent Kiernan's threatening manner. Tr. at 163.

As to her interview at the INS office, the defendant testified that she was advised of her rights in Polish, and that she read the form and signed it. She did not ask for an attorney or request to halt the interview, but explained that her conduct was a result of her nervous state and the pressuring attitude [5] of the agents, who she contended did not give her enough time to assess the situation.

The defendant answered the agents' questions and Agent Simon prepared the affidavit. Defendant testified that the statement and its warning legend contained approximately 50 words which she did not understand at the time. Tr. at 172–78.

After the statement was read to her, she said she did not understand some of the words, but the agents told her that she knew what the affidavit was about and should sign it if she wanted to help herself. The statement was not translated into Polish before she signed it. According to the defendant, the interview ran from 9:30 a. m. to 2:30 p.m., interrupted by the two breaks described by the agents.

The defendant also testified that she was employed at the Richard Schmidt Company where she supervised other employees and acted as an interpreter for her employer. Her duties included helping Polish job applicants to complete applications in English.

## DISCUSSION

*Suppression of the Social Security Card*

■ The Government has indicated that the only item seized from the defendant's apartment on May 30, 1979, which will be offered in evidence against her in the Government's case is the social security card in the name of Stanislawa Sobota.[6] The Government, however, has totally failed to meet its burden of proof to justify the seizure of this social security card.

The search of the defendant's apartment without a search warrant was improper. Even were the Court to conclude that the agents were lawfully in the apartment, there is no evidence whatsoever that the defendant consented to a limited search, must less the extensive search which the agents described in their testimony. On the contrary, the defendant slammed the drawer shut in order to prevent further inspection of its contents by Agent Kiernan. Such circumstances do not indicate that "consent was 'freely and voluntarily given.'" *United States v. Candella*, 469 F.2d 173, 175 (2d Cir. 1972) (quoting *Bumper v.*

---

5. The defendant testified that the agents threatened that she would be deported or spend five years in jail if she did not cooperate with them. Tr. 168–69. She further testified that "[t]hey told me if I cooperate with them, they going to help me stay in the United States if I really want." Tr. at 166. The agents denied having made such statements.

6. Therefore, the Court need not decide whether the social security card in the name of Grazyna Sobota was improperly seized as was originally contended by the defendant at the suppression hearing.

*North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)) (citation omitted).

Furthermore, the Government presented no evidence that the social security card was seized while it was in the "plain view" of the agents, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977), or during a search incident to a lawful arrest, *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Similarly, the Government presented no evidence that the agents were conducting a protective search. *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir.), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1972). The agents were totally incapable of substantiating such claims since they could not remember where or when the seizure of the card took place, aside from the conjecture that it might have been found in the defendant's apartment among her letters or in her pocketbook. Thus, the social security card in the name of Stanislawa Sobota was not properly seized, and the Court grants the defendant's motion to suppress it.

*Suppression of Defendant's Statement*

The defendant contends that the written statement she signed at the INS office on May 30, 1979, was not voluntarily given, and that she did not fully understand it because of her poor English. The Court is unswayed by the latter point. At the very outset of the interview, the defendant was orally informed of her constitutional rights in Polish and signed a waiver of rights form which had been translated into Polish. An interpreter was present at this stage of the interview to aid her in comprehending the form, but she did not indicate that she needed any assistance or desired the presence of an attorney.

The agents testified that defendant said she understood the statement when it was read to her and thereafter read it herself. The defendant's testimony that the statement contained approximately fifty words which she did not understand is not credible.[7] The Court concludes, therefore, that the defendant understood her rights at the time she gave her statement to the agents and that she understood the contents of the statement before she signed it.[8] *See United States v. Dizdar*, 581 F.2d 1031, 1038 (2d Cir. 1978).

A more difficult question is whether the defendant's admissions were voluntarily made after she had been informed of the three options available to the INS agents.[9] In effect, the agents had promised her an adjournment of her deportation hearing and an authorization to work in return for her cooperation with their investigation.

The Supreme Court has indicated that the test of voluntariness is whether "the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (quoting *Bram v. United States*, 168 U.S. 532,

7. The credibility of the defendant on this issue is questionable since this list included words such as "name", "address" and "tourist" which are words she had occasion to use when translating for the Polish employees of her employer. Tr. at 173–74, 176, 187–88.

8. It has been suggested that since the defendant is from a communist country, she may not have comprehended her right to remain silent when questioned by government agents. The Court notes, however, that the defendant had been in the United States for 22 months at the time of her questioning. Having evaluated all the evidence and the demeanor of the defendant, the Court finds that she fully understood her rights.

9. The Court finds no factual basis to the defendant's claims that her statement was involuntary because the agents engaged in coercive tactics, such as prolonged periods of interrogation by groups of agents, *see Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), or the denial of food and drink, *see Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Robinson v. Smith*, 451 F.Supp. 1278 (W.D.N.Y.1978). The agents did not attempt to create an atmosphere of isolation as is evidenced by the fact that the defendant was allowed to telephone her employer when that was requested.

542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). However, the above language

> has never been applied with . . . wooden literalness . . . . The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ."

*United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)); *accord, United States v. Reed*, 572 F.2d 412, 426 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Po-*

*mares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974).

■ In applying the above test to the facts of each case, courts have recognized that the standards it establishes are less than clear.[10] Concepts such as voluntariness, overbearing of will and compulsion have been used by courts as catchwords which indicate that the admission of certain statements would injure other judicial interests.

■ One such interest protected by the courts is that of ensuring that evidence is truthful and reliable. The stronger the inducement brought to bear on an individual, the greater the likelihood that he will retreat from his natural tendency to tell the truth when it is otherwise in his interest to do so.[11] But while the interest in truthful-

---

**10.** The use of the word "voluntary" in regard to the admissibility of statements is misleading since it:

> obscure[s] the fact that (even when threats are used) the situation is always one of choice between two alternatives,—either one disagreeable, to be sure, but still subject to a choice. As between the rack and a false confession, the latter would usually be considered the less disagreeable; but it is none the less voluntarily chosen. The term "voluntary," then, as describing the absence of the vicious element which excludes a confession, is, in ultimate exactness, unsound. All conscious verbal utterances are and must be voluntary; and that which may impel us to distrust one is not the circumstance that it is involuntary, but the circumstance that the choice of false confession is a natural one under the conditions. The choice of false confession is voluntary, but the false confession is associated with a prospect (namely, of escape from present harm) so tempting that it is not in human nature to resist it.

3 J. Wigmore, *Evidence* § 824, at 345 (Chadbourn rev. 1970).

Courts have formulated several practical tests over the years to attempt to facilitate their analysis of the elusive concept of voluntariness. Such tests have focused on (1) the tendency of the inducement to cause an untrue statement, *see* note 11 *infra*; (2) the nature and strength of the inducement; and (3) whether the inducement was the "but for" cause of the statement, *see Hunter v. Swenson*, 372 F.Supp. 287, 298–301 (W.D.Mo.), *aff'd*, 504 F.2d 1104 (8th Cir. 1974), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1410, 43 L.Ed.2d 662 (1975). When utilizing any of the above tests, courts

have also considered specific factors uncovered during an examination of the totality of circumstances. Such specific factors, which vary in importance from case to case, include the health, age, education and mental condition of the accused, as well as the character and length of the detention and interrogation. *See* 3 J. Wigmore, *supra*, § 826 and cases cited therein for a more exhaustive discussion of the various tests.

**11.** In general, then, the position of the confessing person which causes our distrust is that of being compelled to *choose between two alternatives*, one of which involves a confession of guilt irrespective of its truth or falsity. Each instance presented may be thus stated: What were the prospects attending confession (irrespective of its truth) to be weighed by him against the prospects of non-confession? The test of exclusion thus would be: Human nature being what it is, *were the prospects attending confession* (involving the equalization or averaging of the benefit of realizing the promise or the benefit of escaping from the threat, against the drawbacks moral and legal of furnishing damaging evidence), *as weighed at the time against the prospects attending non-confession* (involving a similar averaging), *such as to have created, in any considerable degree, a risk that a false confession would be made?* Putting it more briefly and roughly, Was the inducement such that there was any fair risk of a false confession?

3 J. Wigmore, *supra*, § 824, at 345.

ness may be a factor, it is not always dispositive of the admissibility of a statement, since courts will exclude statements, which, although truthful, were obtained by improper means.[12]

A second related interest is the prevention of police misconduct or overreaching. Thus, courts will exclude statements where the police have engaged in illegal[13] or overbearing[14] conduct or where they have failed to live up to their original bargain.[15] However, police are permitted to offer some promises or inducements when questioning an accused.[16]

Examining the circumstances of the instant case with these interests in mind, the Court concludes that the Government has sustained its burden of proving that the inducements employed by the INS agents were not improper and did not overbear the

defendant's will. Her statement was the result of a careful, calculated determination that cooperation with the INS would be in her best interests.

The Court reaches this conclusion after evaluating all the evidence and the demeanor of the witnesses who testified. The defendant is an intelligent woman in her mid-twenties whose employment responsibilities included the supervision of subordinates. She was not upset or distraught. While the defendant may have had to make a difficult decision, *see United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976), it is unlikely that she was intimidated by the choices presented. On the contrary, when the defendant entered the INS offices, she was informed that she was subject to a deportation hearing. This was not a mere threat, but a statement of fact.[17]

12. The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.
*Spano v. New York*, 360 U.S. 315, 320–21, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *see, e. g., Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (confession inadmissible if induced by drug with the properties of truth serum).

13. *See, e. g., Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (confession induced by brutal beating).

14. *See, e. g., Lynum v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (confession inadmissible where induced by threats that, if defendant did not cooperate, her children would be taken from her and would be deprived of state financial aid); *Spano v. New York*, 360 U.S. 315, 320, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (confession inadmissible where induced by prolonged questioning and falsely induced sympathy).

15. *Compare United States v. Denno*, 259 F.Supp. 784 (S.D.N.Y.1966) (Weinfeld, J.) (statement inadmissible when induced by promise not to prosecute which the prosecution did not honor) *with United States v. Snyder*, 428 F.2d 520, 522 (9th Cir. 1970) (statement admissible where defendant did not honor promise to testify after being granted immunity and ordered to testify).

16. *See Ashdown v. Utah*, 357 U.S. 426, 430, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1957) (prosecutor stated that he had once avoided a criminal charge by cooperating; held permissible); *United States v. Reed*, 572 F.2d 412, 426 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (promise to recommend reasonable bail terms in exchange for cooperation held permissible); *United States v. Pomares*, 499 F.2d 1220 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) (statement that defendant faced heavy penalties and that wisest course was cooperation held permissible); *United States v. Ferrara*, 377 F.2d 16 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) (promise of reduced bail in exchange for cooperation held permissible); *United States v. Cone*, 354 F.2d 119 (2d Cir. 1965), *cert. denied*, 384 U.S. 1023, 86 S.Ct. 1958, 16 L.Ed.2d 1026 (1966) (promise to bring cooperation to the attention of the United States Attorney held permissible); *United States v. Williams*, 447 F.Supp. 631 (D.Del. 1978) (promise of reduced bail and reduced charges in exchange for cooperation held permissible).

17. "In the case at bar even if we were to assume a threat, the threat to take detrimental action arose out of preexisting evidence. A threat to take legal action is not necessarily coercion." *O'Toole v. Scafali*, 386 F.2d 168, 170 (1st Cir. 1967), *cert. denied*, 390 U.S. 985, 88 S.Ct. 1109, 19 L.Ed.2d 1285 (1968) (citations omitted). Although the agents offered the defendant certain benefits if she cooperated, they did not threaten to deprive her of any rights.

When she was informed that her deportation hearing could be held immediately or within two weeks, the officers were accurately representing the possibilities that confronted her as alternatives to the benefits of cooperation. *United States v. Pomares, supra,* 499 F.2d at 1222. The defendant no doubt perceived the benefit,[18] but it is highly unlikely that the benefit offered to her was of such a magnitude that it would have induced her to lie or have otherwise overborne her will.[19]

 The agents did not engage in any illegal or coercive conduct in order to extract a statement from the defendant.[20] Furthermore, after the defendant cooperated by supplying the requested information, the agents honored their agreement by issuing to the defendant an order to show cause returnable in 60 days, her social security card, and a written authorization to work. The agents promised her no more. She was not told that she could stay in this country indefinitely or that no prosecutions would be brought against her. There was no ambiguity in the agents' offer of cooperation, and no unfairness or overreaching.

Moreover, the agents' conduct was not unreasonable, and therefore should not be prohibited. As Judge Lumbard so aptly stated in *United States v. Pomares, supra* :

> Surely, it is the duty of law enforcement officers to assemble all available evidence relating to the commission of a crime and this includes such information as a participant may be willing to give. Having fairly and fully advised Pomares of his constitutional rights, as required by *Miranda,* the agents were free to discuss with Pomares the reasons why he should cooperate. It was quite proper in the course of such discussion to mention the situation which Pomares faced and the advantages to him if he assisted the government. The agents stated facts; they made no misrepresentations. Nothing the agents were shown to have said or done was unfair or overreaching. There was every reason for the agents to act as they did; their conduct did not violate the letter or the spirit of the holding of the Supreme Court in *Miranda.*

499 F.2d at 1222–23; *accord, United States v. Cone,* 354 F.2d 119, 127 (2d Cir. 1965), *cert. denied,* 384 U.S. 1023, 86 S.Ct. 1958, 16 L.Ed.2d 1026 (1966).[21]

**18.** Since the defendant never had the right to seek employment in this country, this case is distinguishable from those where individuals were economically penalized for exercising their right to remain silent. *See Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *United States ex rel. Sanney v. Montayne,* 500 F.2d 411, 415 (2d Cir.), *cert. denied,* 419 U.S. 1027, 95 S.Ct. 506, 42 L.Ed.2d 302 (1974).

**19.** An analogy can be made to plea bargaining. Where the defendant is induced to plead guilty by a promise by the Government, the promise must be fulfilled. *Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The fact that the promise induced the plea, however, does not automatically render it involuntary. Only coercive promises are prohibited. *See Hunter v. Swenson,* 372 F.Supp. 287, 298–301 (W.D.Mo.), *aff'd,* 504 F.2d 1104 (8th Cir. 1974), *cert. denied,* 420 U.S. 980, 95 S.Ct. 1410, 43 L.Ed.2d 662 (1975).

Of course, a plea bargain is not the same as a waiver of the right to remain silent during police interrogation. The Court recognizes that where promises are made when the defendant is not represented by counsel and

Court supervision is unavailable, the circumstances and nature of the promises must be carefully scrutinized.

**20.** A statement may be deemed inadmissible where a promise is combined with other coercive tactics. *See, e. g., Haynes v. Washington,* 373 U.S. 503, 519, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1962) (confession inadmissible where induced by threat of continued isolated detention and the promise of access to family); *United States v. Fay,* 323 F.2d 65 (2d Cir. 1963), *cert. denied,* 381 U.S. 945, 85 S.Ct. 1788, 14 L.Ed.2d 709 (1965) (confession inadmissible after prolonged interrogation and promise to permit visit from wife and chaplain).

**21.** Similarly, Wigmore noted that:

> an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, [a] guilty person is [often] ready and desirous to confess, as soon as he is detected and arrested. This psychological truth, well known to all criminal trial judges, seems to be ignored by some supreme courts.

## CONCLUSION

For the above reasons, the Court grants the defendant's motion to suppress the social security card in the name of Stanislawa Sobota, and denies her motion to suppress the statement taken from her at the INS office on May 30, 1979. Fed.R.Crim.P. 12(b)(3), 41.

These are the Court's findings of facts and conclusions of law. Fed.R.Crim.P. 12(e).

SO ORDERED.

The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession at that moment—the best one. And this expedient, if sanctioned, saves the state a delay and expense in convicting him after he has reacted from his first sensations, has yielded to his friends' solicitations, and comes under the sway of the natural human instinct to struggle to save himself by the aid of all technicalities.

In the case of professional criminals, who usually work in groups, there is often no hope of getting at the group until one of them has "peached," and given the clues to the police. The police know this, and have known it for generations in every country. . . . A thorough questioning of the first suspected person who is caught makes possible the pursuit of the right trail for the others. To forbid this is to tie the hands of the police.

3 J. Wigmore, *supra*, § 851, at 524–25 (footnotes omitted).