## UNITED STATES of America

v.

YONG BING–GONG, a/k/a Yong Pian-Gong, a/k/a Peter, a/k/a Gong; Quah Choon-Pheng, a/k/a Ming, a/k/a Ung Ho Ca; Mak Gin, a/k/a Mak King; Yong Bing-Nam, a/k/a Yong Pian-Nam, a/k/a Bing; Leong Hoong-Siew, a/k/a Simon Leong; Chai Chee Keong, a/k/a Chai Keong; Shirley Wong, a/k/a Yong Yeow-Foong; and Yong Bing-Keong, a/k/a Yong Pian-Keong, a/k/a Toomy Yoong, Defendants.

No. 83–CR–114.

United States District Court, N.D. New York.

Aug. 13, 1984.

Frederick J. Scullin, Jr., U.S. Atty., Albany, N.Y., for the U.S.; David R. Homer, Asst. U.S. Atty., Albany, N.Y., of counsel.

E. Stewart Jones, Jr., Troy, N.Y., for defendant Bing Nam.

Harvey and Harvey, Mumford & Kingsley, Albany, N.Y., for defendant Hoong-Siew; William J. Dreyer, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

On October 20, 1983, a grand jury returned a four-count indictment charging defendants with conspiracy to kidnap and kidnapping, in violation of 18 U.S.C. § 1201(a)(1), and with receiving and conspiracy to receive, possess and dispose of ransom money in violation of 18 U.S.C. §§ 371, 1202.[1]

On April 2, 1984 through April 5, 1984, this Court conducted an evidentiary hearing for the purposes of determining various defendants' pre-trial motions. Included among these were defendant Shirley Wong's motions for severance and to suppress statements; defendant Chee Keong's motion to suppress certain statements, three intercepted telephone conversations, and the fruits of an allegedly illegal search; defendant Yong Bing-Nam's motions to enforce a cooperation/plea agreement and to suppress certain inculpatory pre-arraignment statements; and defendant Leong Hoong-Siew's motion to suppress certain pre-arraignment statements. The motions by defendants Shirley Wong and Chee Keong were denied in their entirety from the bench following the conclusion of the hearing. The motions of defendants Yong Bing-Nam and Leong Hoong-Siew are the subject of the present decision.

### II

On October 2, 1983, Mrs. Yim Ling Eng who, with her husband, owned the Kingston Tea Garden restaurant, was kidnapped from her residence in Hurley, New York. On October 5, 1983, a ransom of $150,000 was paid by Mr. Eng, allegedly through defendant Bing-Nam, to secure the release of his wife. Mrs. Eng was not released and her whereabouts remain unknown, although the Government indicates that evidence points to the fact that she was killed during the abduction. By the following evening, October 6th, evidence developed by a team of investigators had established apparent probable cause to believe that certain employees of the Kingston Tea Garden had participated in the kidnapping.

#### A. *Arrest of Yong Bing-Nam*

Armed with warrants, a force of twenty-two investigators from the New York State Police ("NYSP") descended upon the restaurant on October 6th at approximately 11:30 P.M. Defendant Yong Bing-Nam, along with others, was arrested and transported to the NYSP barracks at Hurley,

---

1. On December 1, 1983, a superseding indictment was returned and filed naming as additional defendants Shirley Wong and Yong Bing-Keong.

New York, arriving there at approximately 12:30 A.M.

At the barracks, Bing-Nam was advised of his *Miranda* rights in English, both orally and in writing, by NYSP Investigator Robert C. Schanck. Bing-Nam executed a written waiver of those rights. Also present with Investigator Schanck was NYSP Investigator Collins. According to Schanck, Bing-Nam understood the English presentation of the *Miranda* rights. At approximately 1:00 A.M., Schanck turned defendant over to Special Agent Wesley Wong of the FBI. Wong, who spoke neither Chinese nor Cantonese, advised Bing-Nam again of his *Miranda* rights both orally and in writing, but again only in English. According to Agent Wong, he showed Bing-Nam a printed *Miranda* form and asked him if he spoke English. Bing-Nam replied affirmatively but asked Wong if he spoke Chinese. Wong replied no. Wong was satisfied that Bing-Nam could speak and understand English and had him sign the rights form. Wong noted, however, that Bing-Nam could not read English. Wong then questioned defendant for about two hours, with additional questions put to defendant by NYSP Investigator Reilly. In response to the questioning, Bing-Nam insisted that he knew nothing about the kidnapping except for a phone call he had received from Mr. Eng on the night of October 2nd. Wong was able to ascertain that Bing-Nam was twenty-six years old and had been in this country for approximately four years, the latter two and one-half of which he had been employed at the Kingston Tea Garden. Wong left the interrogation site sometime between 3:00 A.M. and 4:00 A.M.

At about 8:30 A.M., Bing-Nam was subjected to questioning by NYSP Lieutenant Richard E. Ovens. Ovens questioned Bing-Nam intermittently until approximately 2:00 P.M. that afternoon. In large part, the questioning focused on defendant's possession, at the time of his arrest, of $1,200. Bing-Nam advised Lieutenant Ovens that it was a portion of the ransom money he had kept because Mr. Eng owed it to him. During the course of the Ovens interview, Bing-Nam periodically fell asleep in his chair for fifteen or twenty minute periods, but Lieutenant Ovens testified that Bing-Nam was coherent during the questioning.

At about 9:10 A.M., Special Agent Wong returned to the interrogation site and renewed his questioning concerning the kidnapping. Bing-Nam continued to deny any knowledge of or participation in the crime. Wong left the room sometime between 11:30 A.M. and 12:00 noon and returned between 1:00 P.M. and 1:30 P.M. Bing-Nam had by this point been in custody for more than twelve hours and no attempt to have him arraigned had yet been made. When Wong returned again between 1:00 P.M. and 2:00 P.M., he advised Bing-Nam of the charges against him. When Bing-Nam asked Wong how long a sentence he could receive, Wong replied that the maximum term of imprisonment could be life. Bing-Nam expressed great shock at the severity of such a sentence and Wong then advised him that any sentence would ultimately be determined by a court. Agent Wong then left the room.

Sometime around 2:00 P.M., Special Agent Joseph W. Flynn of the FBI entered the interrogation room; Agent Wong returned shortly thereafter. The agents discussed with Bing-Nam his offer to tell what he knew about the kidnapping in return for immunity from prosecution or, in defendant's words, for "no jail time." After some preliminary discussions, Agent Flynn departed to relate defendant's offer to his superiors. Between 2:30 P.M. and 4:00 P.M., the agents discussed Bing-Nam's offer both with their superiors and with the United States Attorney's Office in Albany. Agent Flynn soon returned to the interrogation room and formulated a list of seven questions he considered significant to the investigation. Flynn showed the list to Bing-Nam who replied that he could answer five of the seven questions but that he was unaware of where Mrs. Eng was or where those involved in the abduction were.

At approximately 3:30 P.M., agents Flynn and Wong were advised by their superiors that the United States Attorney's Office had authorized an agreement with Bing-Nam based upon certain terms and conditions. In substance, the agreement embodied the following conditions: (1) defendant was to answer the questions asked of him truthfully and completely; (2) the Government would limit the maximum sentence which the defendant could receive to ten years, which, if imposed, would allow a possibility of release after three and one-third years; (3) if it was later determined that defendant had withheld information or had been untruthful, the agreement would be nullified; and (4) the defendant's agreement to cooperate was a continuing one. After being advised of its terms, and after some initial hesitation, Bing-Nam accepted the agreement.

Between 4:00 P.M. and 7:00 P.M., and pursuant to the terms of the agreement, Agents Flynn and Wong commenced their interview of Bing-Nam. Bing-Nam then provided the agents with a detailed narrative of the events in question and provided answers to the five questions to which he had earlier indicated he could. At approximately 7:00 P.M., nearly twenty hours after his arrest, defendant was arraigned before the local town justice.

### B. *Arrest of Leong Hoong-Siew*

On October 7, 1983 at approximately 8:00 P.M., NYSP Investigator Steven Brignoli and FBI Special Agent James Ausanio, along with other FBI and NYSP personnel, proceeded to Eng's II Restaurant in Kingston, New York for the purpose of "picking up" Hoong-Siew for questioning and possibly to arrest this defendant. Once inside the restaurant, Brignoli and Ausanio were directed to Hoong-Siew by a fellow employee. When Ausanio approached Hoong-Siew and indicated his desire to question him, Hoong-Siew stated he was busy with work and requested time to finish his duties. Ausanio assented to this request, and waited with Brignoli for Hoong-Siew in the restaurant's lobby for approximately ten to fifteen minutes.

At approximately 8:30 P.M., Ausanio again requested that Hoong-Siew accompany him, which Hoong-Siew agreed to do. The two then proceeded to Ausanio's vehicle in which Brignoli was waiting. At that time, Hoong-Siew was advised that the officers intended to question him at the NYSP barracks concerning Mrs. Eng's kidnapping, and Hoong-Siew indicated his desire to help in the investigation.

Upon arrival at the barracks the three men proceeded to an office where they seated themselves. Brignoli orally advised Hoong-Siew of his *Miranda* rights, i.e., that he had a right to remain silent, anything he said could be used against him in a court of law, he had the right to an attorney, and if he could not afford an attorney, one would be provided for him. Although defendant then stated that he understood these rights, he now contends that, because of difficulty with the English language, in fact, he did not understand these *Miranda* warnings.

The interrogation that followed was conducted entirely in English, and Hoong-Siew never requested the aid of an interpreter. During the interrogation, defendant was offered cigarettes and refreshments and was permitted to use the bathroom upon request.

After approximately three hours of interrogation, officers Brignoli and Ausanio informed Hoong-Siew of their belief that he had not been entirely forthright in answering their questions. About the same time, Hoong-Siew was permitted to call his girlfriend, Katherine McCullough. Although Hoong-Siew did place the call, and Brignoli testified that he observed defendant speak into the phone, Hoong-Siew and McCullough both testified that the call was not received by McCullough. At approximately 12:30 A.M., FBI Special Agent Flynn joined in the interrogation of Hoong-Siew. Flynn eventually was replaced by Special Agent Delp, and the interrogation proceeded for approximately three more hours.

At that time Ms. McCullough came to the NYSP station where she was questioned for approximately thirty minutes. Follow-

ing that questioning, McCullough and Hoong-Siew were placed in the same room and the questioning continued for a short time. Defendant was taken for arraignment on state criminal charges between 4:30 A.M. and 5:00 A.M. on October 8, 1983, approximately eight hours after being taken into custody at Eng's II Restaurant by Ausanio and Brignoli.

### III

### *The present motions*

#### A. *Yong Bing-Nam's motions*

1. *Suppression of pre-arraignment statements*

On a number of grounds, Bing-Nam moves to suppress all statements made by him prior to his arraignment at 7:00 P.M. on October 7, 1983. In particular, defendant argues (1) that the delay between arrest and arraignment renders any statements made during that period invalid; (2) statements made as a result of plea/cooperation bargaining are inadmissible; (3) there is insufficient proof of a knowing waiver of *Miranda* rights; and (4) the statements must be suppressed due to the coercive atmosphere attendant upon his interrogation and the coercive techniques employed. Because the Court concludes that the delay between arrest and arraignment was so manifestly unreasonable under the circumstances as to warrant suppression, there is no need to consider defendant's alternative arguments.[2]

Fed.R.Crim.P. 5(a) provides, in pertinent part:

An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant *shall take the arrested person without unnecessary delay* before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state

or local judicial officer authorized by 18 U.S.C. § 3041.

(emphasis added). Both prior to and after the adoption of Fed.R.Crim.P. 5(a), the Supreme Court had sanctioned an exclusionary remedy for violation of a defendant's right to a prompt arraignment. *Mallory v. United States*, 354 U.S. 449, 452, 77 S.Ct. 1356, 1358, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 343–44, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943). After the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Congress enacted Title II of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 3501. Relevant for present purposes is section 3501(c) of that statute, which provides:

In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest

---

**2.** The court notes with interest that defendant's motion to suppress statements obtained in violation of his *Miranda* rights based on his unfamiliarity with the English language is palpably in conflict with his attempt to enforce the plea/cooperation agreement discussed *infra*. To the

extent defendant was comfortable enough with the language to comprehend and respond to the agreement, the Court finds it difficult to see how defendant can proclaim an inability to speak well enough to understand and properly waive his *Miranda* rights.

available such magistrate or other officer. ·

(emphasis in original). Based on that section, the Second Circuit has recently held that "a delay of greater than six hours [in presentment to a magistrate] *may* by itself be grounds for suppression unless the delay is found to be reasonable," *United States v. Perez*, 733 F.2d 1026, 1030 (2d Cir.1984) (emphasis in original), and concluded that "discretion is vested in a district court judge to exclude a confession upon his finding that a delay of more than six hours was not reasonable." *Id.* at 1035. In the present case, the conclusion is inescapable that the twenty hour delay in presenting defendant to the town justice for arraignment was unreasonable.

■ Significantly, the Government has made no attempt to demonstrate that the delay here was in fact reasonable. Indeed, in its post-hearing memorandum of law, the Government advises the Court that with respect to "the defendant's motion to suppress his statements, the United States relies on its Affidavit in Opposition to Defendant's Pretrial Motions ... at pages 15–21," Government's Post-Hearing Memorandum of Law at 1, although the affidavit referred to makes no mention of the question of delay. Based on the testimony adduced at the hearing, and the failure of the Government to offer any explanation for the delay, the Court is constrained to find that such delay was palpably unreasonable and defendant's statements must therefore be suppressed.

In particular, in light of the circumstances surrounding the lengthy pre-arraignment delay, the Court finds that the arresting officers "had no legitimate excuse for not arraigning [defendant] promptly." *United States v. Perez*, 733 F.2d at 1036. First, although defendant was arrested late in the evening when, presumably, no magistrate was reasonably available, the next morning, Friday, was a normal business day and there was no conceivable reason why defendant could not have been presented then. Second, this is not a case where agents would have had to have traveled a great distance to procure an arraigning magistrate. Indeed, Town Justice Dumont, before whom defendant was ultimately arraigned, was located but three-quarters of a mile from the NYSP barracks, the site at which defendant was being detained. Moreover, it is clear that the combined force of federal and state agents participating in defendant's arrest provided ample manpower with which to procure defendant's arraignment without seriously affecting the team's ability to get on with its investigative efforts. Absent a showing of circumstances warranting the exceedingly long twenty hour delay, the Court has little difficulty concluding that the arresting officers "had no legitimate excuse for not arraigning [defendant] promptly," and that therefore, all statements made by defendant during this period must be suppressed.

## 2. *Enforcement of the cooperation/plea agreement*

Defendant seeks to have the terms of the agreement at issue specifically enforced. Essentially, defendant argues that he has fulfilled his obligations under the agreement and that therefore the Government is not entitled to withdraw its offer of a reduced charge. After careful consideration of the hearing testimony, the Court concludes that because defendant has failed to substantially comply with his obligations under the terms of the cooperation agreement, he is not entitled to enforcement of that agreement. *Cf. United States v. Fisher*, 700 F.2d 780, 785 (2d Cir.1983) ("When the Government's promise of confidentiality is based on fraudulent or misleading premises supplied or left in place by the defendant, the Government does not violate the defendant's Fifth Amendment rights by disregarding the promise").

■ Although the agreement at issue here is more in the nature of a cooperation agreement than a plea agreement, it appears that the two are to be treated similarly with respect to their enforcement. *See United States v. Irwin*, 612 F.2d 1182, 1183, 1189–91 (9th Cir.1980); *United States*

*v. Garcia,* 519 F.2d 1343, 1345 (9th Cir. 1975). Generally, because plea bargaining "presuppose[s] fairness in securing agreement between an accused and a prosecutor ..., [a court must afford] safeguards to insure the defendant what is reasonably due in the circumstances." *Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *Siegel v. New York,* 691 F.2d 620, 623 (2d Cir.1982), *cert. denied,* 459 U.S. 1209, 103 S.Ct. 1201, 75 L.Ed.2d 443 (1983). In determining what is reasonably due, the courts have looked first to what the parties reasonably understood to be the terms of the agreement. *United States v. Arnett,* 628 F.2d 1162, 1164 (9th Cir.1979); *Mosher v. La-Vallee,* 491 F.2d 1346, 1348 (2d Cir.), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974). Next, the courts consider whether there was fraud or mistake in the bargaining process itself. *United States v. Fisher,* 700 F.2d 780 (2d Cir.1983). Finally, the courts examine the performance of the conditions of the agreement by the party seeking performance. *See Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 352, 83 S.Ct. 448, 455, 9 L.Ed.2d 357 (1963) (withdrawn offer of immunity); *United States v. Tramunti,* 500 F.2d 1334, 1343–44 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

The basis for defendant's position is that the seven questions posed by the FBI agents, with the exception of the two he claimed he would not be able to answer, were all answered. The fundamental misapprehension under which defendant seems to labor is that detailed answers to those specific questions embodied fulfillment on his part of the terms of the agreement. While defendant argues that "[h]e cannot be faulted for being somewhat selective," in his answers, Memorandum of Law of Defendant Yong Bing-Nam at 11, and that '[i]f the agents wanted more details, they could have asked," *id.* at 13, the Court is persuaded that defendant's response to questioning breached fundamental terms of the agreement, viz., that his answers be truthful and complete, and that his obliga-

tion to cooperate be a continuing one. Contrary to defendant's suggestion, the Government did not seek to impose additional conditions upon defendant but rather sought only to obtain the full cooperation for which it had bargained. That cooperation was not forthcoming and its absence has been identified by the Government in exhaustive detail. In particular: defendant failed to reveal that two meetings of the alleged co-conspirators, including himself, took place at restaurants in Kingston, New York, and New York City on September 25th and 26th, 1983, when plans for the kidnapping were finalized; similarly, defendant failed to reveal a meeting of some of the alleged conspirators at the Skytop Motel in Kingston on September 29th and 30th; while defendant stated that three of the alleged abductors, whom he identified, used a rented or borrowed vehicle to effect the kidnapping, he failed to reveal that he and his brother had themselves rented the vehicle on September 30, 1983 from a dealership in Bridgewater, New Jersey; defendant stated that on October 3, 1983, approximately six hours after the kidnapping was discovered, he contacted codefendant Yong Bing-Gong in New York City from a telephone at the Kingston Tea Garden. Defendant failed to reveal, however, that the call was made to the residence of codefendant Shirley Wong in Sommerville, New Jersey; defendant failed to reveal that from September 25th to October 5th, immediately before and after the October 2nd kidnapping, he had made numerous phone calls to and from the residences of codefendants Chai Chee Keong in New York City and Shirley Wong in New Jersey; defendant provided little information concerning the three alleged abductors despite the facts that one was his brother, a second was a former coworker at the Kingston Tea Garden, and the third was allegedly recruited to effect the kidnapping by defendant himself. Compounding these demonstrated deficiencies, and notwithstanding defendant's agreement to continue to cooperate, defendant has failed to

offer investigators any information since his interview on October 7th.

While there is no question that defendant has provided the Government with important information, it is equally clear that his misstatements, omissions, and continued failure to cooperate have deprived the Government of its bargained-for benefit. Accordingly, in light of defendant's breach, the Court will not require the Government to perform the agreement.

### B. *Leong Hoong Siew's motions*

#### 1. *Suppression of pre-arraignment statements*

#### a. *Miranda violations*

Hoong-Siew claims that statements made by him during the interrogation at the NYSP barracks must be suppressed because neither the State Police nor the FBI Special Agents complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, Hoong-Siew contends (1) that he never received *Miranda* warnings; (2) if he did receive the necessary warnings, they were not understood because of defendant's difficulty with the English language; and (3) defendant's difficulty with the English language precludes any finding of a knowing and voluntary waiver of his *Miranda* rights. *See Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■ The threshold question here, whether the statements were made during the course of a custodial interrogation, is resolved by the Government's concession that Hoong-Siew was in custody at the time the statements were elicited. Accordingly, the Government now bears the heavy burden of establishing that defendant was advised of his constitutional rights and that he effected a knowing and intelligent waiver of those rights. *Miranda v. Arizona*, 384 U.S. at 478–79, 86 S.Ct. at 1629–30; *United States v. Brown*, 569 F.2d 236 (5th Cir. 1978) (en banc). This Court finds and concludes that the Government has met that heavy burden here.

Whether defendant actually received *Miranda* warnings appears to be in dispute.

Both Brignoli and Ausanio testified that Hoong-Siew was advised of his rights upon arrival at the police station. Hoong-Siew, however, testified that no such warnings were provided.

■ Counsel for defendant notes this apparent conflict, but explains that defendant's testimony can be reconciled with that of Brignoli and Ausanio by taking into account Hoong-Siew's unfamiliarity with the English language. This Court disagrees, and rejects defendant's testimony that warnings never were provided to him, as well as his claimed inability to comprehend conversational English.

During the hearing, three individuals testified that Hoong-Siew characteristically will nod his head as if in agreement with the person to whom he is speaking while also saying "yes, yes" even if he cannot understand what is being said to him. These witnesses were Kathy McCullough, Hoong-Siew's girlfriend; Ann McCullough, Kathy's mother; and Mary Lou Knapp, a former co-employee of Hoong-Siew. After hearing these witnesses testify, this Court believes that, in view of their close personal relationships with defendant, their testimony must be accorded only limited weight. Kathy McCullough has been defendant's girlfriend for longer than three years. Similarly, Mary Lou Knapp was described as a "good friend" of defendant.

The Government is quick to indicate the apparent bias of these three witnesses, and provides the following: "In contrast, there is the testimony of the five investigators, each of whom lacks any such bias." Government's Post-Hearing Memorandum of Law at 11. This Court does not hold as firm a conviction as does counsel for the Government that state police investigators and FBI special agents necessarily are free from bias when testifying in a criminal case in which they are intimately involved. However, this Court does conclude that the circumstances surrounding Hoong-Siew's interrogation, as well as certain other undisputed facts, indicate that Hoong-Siew did, in fact, understand the *Miranda* warn-

ings provided to him, and that he voluntarily waived the rights so provided.

The Court attaches considerable significance to defendant's close and personal relationship of approximately three years with Kathy McCullough, who speaks only English. Hoong-Siew also maintained a close relationship with Kathy's English-speaking family, and has socialized with English-speaking friends. Moreover, since Hoong-Siew's arrival in this country in 1979, he has worked in Chinese restaurants, and he indicates having "studied English for about seven years."

At the time defendant was being questioned, he never requested the aid of an interpreter, nor did he provide any indication that he was unable to comprehend the questions put to him. Similarly, defendant did not request an interpreter at his arraignment.[3] Under these circumstances, this Court concludes that, as testified to by the various NYSP investigators and FBI special agents, defendant properly was advised of, understood, and, at least impliedly, voluntarily chose to waive his *Miranda* rights. *See United States v. Silva,* 715 F.2d 43, 49 (2d Cir.1983).[4]

b. *Pre-arraignment delay*

■ The principles enunciated above concerning Yong Bing-Nam's pre-arraignment delay are equally applicable with respect to defendant Hoong-Siew. Here, the Government and Hoong-Siew disagree when certain statements were made, i.e., whether they were made within six hours of Hoong-Siew's arrest or in the final two hours of his interrogation. *See* 18 U.S.C. § 3501(c). This Court finds it unnecessary to resolve this dispute, however, since the Court concludes that, in any event, the additional two hours of delay during the eight hour period between defendant's arrest and his arraignment were entirely reasonable in the circumstances presented here.

First, the two hour delay here beyond the six hours specified in § 3501 is relatively short. *Cf. United States v. Perez,* 733 F.2d 1026 (2d Cir.1984) (twenty-three hour delay unreasonable); *United States v. Collins,* 462 F.2d 792 (2d Cir.) (twenty-six hour delay reasonable), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972); *United States v. Marrero,* 450 F.2d 373 (2d Cir.1971) (sixteen hour delay reasonable), *cert. denied,* 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972); *United States v. Pimentel,* 459 F.Supp. 923 (S.D.N.Y.1978) (thirteen and one-half hour delay reasonable). Second, this Court already has determined that defendant understood his *Miranda* rights and effected a knowing and voluntary waiver of those rights, an additional factor in determining the reasonableness of pre-arraignment delay. *See, e.g., United States v. Marrero,* 450 F.2d at 376; *United States v. Price,* 345 F.2d 256, 261 (2d Cir.), *cert. denied,* 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965). Third, it is apparent to the Court that the additional two hours of questioning were used for the legitimate purpose of pursuing a line of questioning initiated earlier on in the interrogation of Hoong-Siew, *see, e.g., United States v. Collins,* 462 F.2d at 795–96, and there is no credible evidence of coercive tactics being employed during these final two hours. *See United States v. Rubio,* 709 F.2d 146, 153 (2d Cir.1983). Finally, approximately one-half hour of the delay is attributable to defendant's request to speak with Kathy McCullough following her arrival at the police barracks.

---

**3.** In fact, during the hearing before this Court, Hoong-Siew would occasionally answer questions put to him before the interpreter had the opportunity to translate the questions for him.

**4.** Defendant's contention that his statements must be suppressed because of the investigating officers' failure to advise him that he was under arrest or a suspect is rejected. *See United States v. Burger,* 728 F.2d 140 (2d Cir.1984). Similarly, Leong's contention that the statements are sup-

pressable because the officers led him to believe cooperation was in his best interest also is rejected. *See e.g., Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Ballard,* 586 F.2d 1060 (5th Cir. 1978); *cf. United States v. Mast,* 735 F.2d 745, 751 (2d Cir.1984) (Government official's advice to subject of criminal investigation did not overbear individual's will).

### c. *Coercion*

■ Hoong-Siew does not allege the use of physical force or threats by the investigators to elicit incriminating statements from him. Rather, he asserts that the very methods employed during his interrogation were such as to coerce the statements allegedly made by him. This Court finds such contention devoid of merit.

Defendant was permitted additional time to complete his work duties before being brought to the NYSP barracks. He never was handcuffed during this period or the period during which he was questioned. It appears that defendant was treated with reasonable courtesy during the interrogation, being allowed to use the bathroom, have a drink or a cigarette, and being permitted to speak privately with his girlfriend after her arrival at the police barracks.

This Court finds no undue coercive effect on Hoong-Siew merely by virtue of the number of officers participating in the interrogation. Similarly, the eight hour duration of the interrogation, without more, affords no basis for a finding of coercion.

Finally, although Hoong-Siew never was advised that he was a suspect in the kidnapping, he was informed of the subject into which the officers intended to inquire. Accordingly, the Court finds no basis upon which to conclude that the investigating officers deceived defendant in this regard. In conclusion, therefore, this Court is convinced that defendant was not subjected to any police tactics indicating that he was coerced into making the statements subject of this motion.

### d. *Unreliability of statements*

■ Finally, in the words of counsel for the Government, "defendant Leong asserts what appears to be an unprecedented basis for suppression." Government's Memorandum at 36. Relying on Fed.R.Evid. 403 and the decision in *United States v. Gorayska,* 482 F.Supp. 576 (S.D.N.Y.1979), defendant argues that his statements to police investigators are so inherently unreliable, that they must be suppressed. This Court disagrees.

Although Fed.R.Evid. 403 very well may provide the Court with sufficient authority to suppress an alleged confession following a determination of unreliability, this Court concludes in the case at bar that the proper measure for determining the admissibility of such statements is found in the provisions of 18 U.S.C. § 3501 as outlined above. Specifically, the Court already has found Hoong-Siew's statements to the investigators "to have been made voluntarily." 18 U.S.C. § 3501(c). Accordingly, the weight to be given these statements will be left to the jury. *Id.*

*United States v. Gorayska,* 482 F.Supp. 576 (S.D.N.Y.1979), relied upon by defendant, does not mandate a different result. There, Judge Cannella remarked that

[c]oncepts such as voluntariness, overbearing of will and compulsion have been used by the courts as catchwords which indicate that the admission of certain statements would injure other judicial interests.

One such interest protected by the courts is that of ensuring that evidence is truthful and reliable. The stronger the inducement brought to bear on an individual, the greater the likelihood that he will retreat from his natural tendency to tell the truth when it is otherwise in his interest to do so.

*Id.* at 582 (footnote omitted). It appears, therefore, that Judge Cannella indicated simply that confessions which result from "overbearing of will" and "compulsion" are more apt also to be unreliable. Stated another way, the question of reliability is not separate and distinct from the question of voluntariness, contrary to the argument Hoong-Siew now advances. Moreover, there is no mention of Fed.R.Evid. 403 in *Gorayska.* In conclusion, having previously determined that Hoong-Siew's statements were made voluntarily, the weight they are to be accorded will be left to the jury in accordance with the provisions of 18 U.S.C. § 3501(c).

### IV

For the reasons set forth above, defendant Yong Bing-Nam's motion to suppress

his pre-arraignment statements is granted. Yong Bing-Nam's motion to enforce the terms of the cooperation/plea agreement is denied. Defendant Leong Hoong-Siew's motion to suppress his pre-arraignment statements is denied in its entirety.

It is so Ordered.