UNITED STATES of America, Appellee,

v.

Howard FISHER, Appellant.

No. 401, Docket 82–1217.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1982.

Decided Feb. 1, 1983.

Barry E. Griffith, Rutland, Vt., for appellant.

Peter W. Hall, Asst. U.S. Atty., Rutland, Vt. (George W.F. Cook, U.S. Atty., D. Vermont, Rutland, Vt., Patti R. Page, Sheila M. Ware, Asst. U.S. Attys., Burlington, Vt., of counsel), for appellee.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and BONSAL,* District Judge.

OAKES, Circuit Judge:

A convicted felon, Howard Fisher, posing as Howard Ashe, purchased assorted handguns from three Vermont dealers on August 5, August 19, and October 14, 1980, in violation of the Federal Firearms Act, 18 U.S.C. §§ 922(a)(6), 922(h), 924(a). Fisher was tried and convicted of these charges by the United States District Court for the District of Vermont, James S. Holden, Chief Judge. Fisher challenges his conviction on the grounds that the evidence against him derived principally from statements he made to New York State Police Investigator Kenneth W. Graham who, Fisher claims, had given telephone assurances to Fisher that his admissions would not be forwarded to federal authorities, a promise that Graham broke. The statements given to the federal officials are thus said to have been involuntary. *See Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). The district court declined to suppress photographic identifications by two of the dealers from whom Fisher had purchased guns as well as statements made by Fisher to Graham, holding that Fisher, not a defendant or under arrest as was the defendant in *Bram,* "sought personal advantage" from the state officer who gave "[n]o assurance" to Fisher. *United States v. Fisher,* No. 81–56–1, Findings of Fact and Conclusion (D.Vt. Mar. 5, 1982). The statements were, however, not offered in evidence. We affirm.

In November of 1980 in Middletown, New York, a New York state trooper was shot after stopping a speeding car. Suspects were apprehended and their gun, a Smith & Wesson .38 was quickly traced by Investigator Graham to Norm's Gun Shop in White River Junction, Vermont where Fisher had purchased it under the name of Howard Ashe, giving Marshfield, Vermont as his address. After checking the Marshfield area and failing to find Howard Ashe, Graham traced the registration of the car Ashe had used. The gun shop owner had noted the car's New York license plate. The car led Graham to Fisher's former employer in Manhattan. By this kind of steady, cross-checking police work that makes for little drama but is often most effective, the police learned of Fisher and noted the similarity of the date of his birth (10/15/51) and that of the supposed gun purchaser, Howard Ashe (10/5/51). Fisher was contacted on December 8, 1980. He indicated at that

---

* Of the Southern District of New York, sitting by designation.

time that he might have been the person who purchased the gun that was used in the shooting and that he would be willing to meet Graham the next day in Middletown.

That evening Fisher called Graham to discuss the proposed meeting. Taping the call, Fisher asked Graham a variety of hypothetical questions dealing with third persons and seeking to elicit whether the gun purchaser was in trouble. In the course of the call Fisher did not volunteer that he was the purchaser or that he had a previous felony conviction; indeed he implied that someone else had bought the gun, and that it had been stolen from that other person. Graham told Fisher in response to one of the hypotheticals that the federal authorities were "not going to be advised anyway" and that "anything you say is confidential. Nobody's going to find out about it or anything else. It's strictly between you and me and the four walls, you know." Fisher agreed to meet Graham the next day and did so.

At the meeting in Middletown, Graham advised Fisher that he was free to leave at any time and that he could have a lawyer present if he wished. After Fisher had obtained an assurance from Graham that he would not be arrested and had also obtained an assurance from the Orange County, New York, District Attorney that the person from whom the gun was stolen (whether a third person or Fisher) would not be prosecuted there, both of which assurances were kept, Fisher prepared a written statement admitting that he had purchased the gun used in the shooting and claiming that the gun was stolen from him in a holdup in Queens in September 1980.

Graham, seeking assistance in tracing the gun used in the state trooper shooting, subsequently turned Fisher's statement over to agent John Bartley of the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) in January 1981. This was evidently part of Graham's continuing investigation into whether there was a "radical" source of guns used by criminals shooting police officers. Bartley forwarded the report to ATF agent Ken Varriale in Springfield, Massa-

chusetts, who then recalled an earlier report from a gun dealer at East Braintree, Vermont that a man named Howard Ashe had behaved suspiciously while purchasing a gun. He began to investigate Howard Ashe. Shortly thereafter, on January 21, 1981, and while Varriale's investigation was underway Fisher was arrested at the New York/Canada border carrying a Beretta handgun. ATF Agent Paul Duquennois learned that the Beretta had been purchased some fifteen months before at the Mountain Sports Shop in Stowe, Vermont by Howard Ashe. Duquennois forwarded this information and Fisher's name and photograph to Varriale who then canvassed the major gun dealers in Vermont including the dealers from White River Junction and East Braintree. Shown a now-concededly appropriate photo spread, these two dealers identified Fisher as the individual who had purchased guns under the name of Howard Ashe. The Stowe dealer was, however, unable to identify Fisher as Ashe. Fingerprints and holographic analysis confirmed that Fisher had handled and signed the purchase forms required under federal law.

Fisher was charged with furnishing false information in connection with the purchase of firearms, and illegal possession of firearms as a prior felon under 18 U.S.C. §§ 922(a)(6), 922(h), 924(a). The trial court denied a motion to suppress the statement made to Investigator Graham on December 9, 1980, although the Government did not use it at trial. The court also denied a motion to suppress identification of Fisher by the two Vermont gun dealers as being "in no way affected" or "tainted" by Fisher's statements to Graham or any impermissible conduct on the part of Graham.

█ On the issue of voluntariness, our circuit's cases establish that an admission of guilt is not involuntary merely because it is made in response to official requests to cooperate or official promises of cooperation. *See, e.g., United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.) (defendant's confession not involuntary because officials urged cooperation as the "best course," exerted no physical coercion, nor made specif-

ic promises), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.) (defendant's statement not involuntary because federal agent told defendant that if he cooperated, agent was sure that bail would be reduced and defendant could go free), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967).

*Bram* states, however, that a confession is involuntary and inadmissible if "obtained by any direct or implied promises, however slight." 168 U.S. at 542–43, 18 S.Ct. at 187, *quoting* 3 Russell on Crimes (6th ed. 1896) 478. *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), reminds us that "evidence of guilt induced from a person under a governmental promise of immunity . . . must be excluded under the Self-Incrimination Clause of the Fifth Amendment. . . . Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." *Id.* at 347–48, 83 S.Ct. at 453. *Brady v. United States,* 397 U.S. 742, 753–55, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747 (1970), refined the *Bram* principle by holding that a guilty plea is not "involuntary" even though it was made in the hope of avoiding possibly greater penalties that might flow from a jury trial. *Bram* was distinguished as dealing with "a confession given by a defendant in custody, alone and unrepresented by counsel" in which case "even a mild promise of leniency" might bar the confession. *Id.* at 754, 90 S.Ct. at 1472. We note that (1) Fisher came to the state police barracks freely, unaccompanied by police officers; (2) he was not under arrest or even "in custody" when he made the admission; (3) he was told that he could have a lawyer with him if he desired. *Cf. Beckwith v. United States,* 425 U.S. 341,

347–48, 96 S.Ct. 1612, 1616–1617, 48 L.Ed.2d 1 (1976) (although *Miranda* warnings not required in noncustodial interrogation of taxpayer by IRS agent in taxpayer's home, appellate court must examine entire record to determine whether statements used against taxpayer were made voluntarily).

The *Brady* Court indicated, however, that mere freedom from the physical and psychological coercion of custody is not sufficient to make a plea of guilty voluntary if it is induced by "misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes)." 397 U.S. at 755, 90 S.Ct. at 1472, *quoting Shelton v. United States,* 246 F.2d 571, 572 n. 2 (5th Cir.1957) (*en banc*) (plea of guilty on assurances of prosecutor), *rev'd on other grounds,* 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958). Similar principles led the Court in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), to hold that where a guilty plea "rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 498.

Fisher, analogizing his statements to Graham to a plea of guilty, argues that they were "involuntary" because the promise that led to them—Graham's promise not to inform the federal authorities—was not honored. Fisher's taping the original conversation with Graham and the reference to federal authorities do suggest that the admission was made because Graham assured Fisher that nothing would be said to federal authorities.[1] Thus under *Brady's* language, there is a fair ground for arguing that this unfulfilled promise is a "misrepresentation."

---

1. The Government argues that Graham's assurances did not figure significantly in Fisher's decision to cooperate because the references to federal authorities were few and couched in hypothetical terms, and the only explicit assurance given the next day concerned state prosecution. While it is true that Fisher sought and received from Graham specific assurance that the federal authorities would not be informed

of the hypothetical purchaser's using a fictitious name, it is entirely possible that Fisher thought that assurance would hold even if it turned out, as in fact it did, that Fisher was the purchaser. Of course, if Graham had known that Fisher were a convicted felon (Graham only checked to see if Fisher had a record in New York) he presumably would never have given any such an assurance either.

■ We note at the outset that Fisher's admissions to Graham were never introduced into evidence at Fisher's trial. Thus, any argument over its illegality falls flat unless it can be linked to other evidence that actually formed the basis of Fisher's conviction. Three facts link the Graham conversation to the ATF investigation: Fisher's written statement to Graham was forwarded to ATF agent Varriale; Varriale was reminded of a gun purchase by Howard Ashe at East Braintree when Varriale heard of Fisher's statement to Graham; and Varriale initiated his own investigation after receipt of this information. But no allegation is made that the arrest on the New York/Canada border with an illegal pistol only a few days after Varriale's investigation began was prompted by the revelation of Fisher's conversation to Agent Varriale; Varriale testified that the referral from Duquennois alone would have caused him to undertake his investigation. Once Fisher had been arrested, the evidence against him was compiled in a routine fashion that would inevitably have led to Fisher's discovery. As Varriale had done in as many as a dozen other Vermont firearms investigations, he asked the major gun dealers in Vermont if they had recorded any purchases by Howard Fisher or Howard Ashe. He displayed a concededly appropriate photo spread to the three dealers with such records, two of whom quickly identified Fisher.

Thus, we agree with the district court which found that the evidence offered by the Government in support of Fisher's conviction was "derived from sources independent, in any event, from the statements made by the defendant to ... Graham," thereby removing Fisher's statements from the protection of the Fifth Amendment by way of the "inevitable discovery" exception to the exclusionary rule, one of "three commonly advanced exceptions to the exclusionary rule—the 'independent source,' 'inevitable discovery,' or 'attenuation' doctrines." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). *See also United States v. Alvarez-Porras*, 643 F.2d 54, 65–66 (2d Cir.)

(where " 'there is no need to speculate as to whether the evidence ... would ultimately have been found' .... suppressing the evidence seized would not serve the deterrent purposes of the exclusionary rule"), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); *United States v. Falley*, 489 F.2d 33, 41 (2d Cir.1973) ("If the evidence produced by the investigation was simply the normal output of that investigation, then the investigative findings have not been tainted directly."); *United States v. Cole*, 463 F.2d 163, 174 (2d Cir.) ("saturation investigation" was not tainted by illegal wiretap which contributed to, but did not trigger, investigation and which was not admitted at trial), *cert. denied*, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972).

■ Because the discovery of Fisher's crimes was inevitable once he was arrested at the border with a gun purchased in Vermont, any assurance he received from Graham becomes irrelevant since it would not have saved Fisher from federal investigation. We add, however, that any breach of promise by Graham was itself not a violation of Fisher's Fifth Amendment rights, under all of the circumstances.

First, Graham was not obliged to give Fisher *Miranda* warnings in the course of their conversation. Fisher, not Graham, initiated the call. Fisher was not the target of Graham's investigation and even if Graham's investigation might eventually have led the government to prosecute Fisher, Fisher was at most a possible suspect at the time of the Graham conversation and not, therefore, entitled to *Miranda* warnings or other, attendant Fifth Amendment protections. *See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *see also United States v. Washington*, 431 U.S. 181, 190–91 & n. 6, 97 S.Ct. 1814, 1820 & n. 6, 52 L.Ed.2d 238 (1977) (failure to advise grand jury witness of status as potential defendant does not require suppression of testimony at trial); *accord, United States v. James*, 609 F.2d 36, 41 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

■ Second, any "bargain" between Graham and Fisher was based on one misrepresentation and one misleading omission by Fisher. Fisher told Graham in the telephone conversation that he had received the gun from Howard Ashe, although it was stolen from him, Fisher. Graham was led to believe that Ashe and Fisher were not one and the same person. Any telephone promise by Graham that Fisher's information would remain secret was thus bottomed on the assumption that Fisher and Ashe were not the same person, note 1 *supra,* and therefore that Fisher had not purchased the gun using a false name in violation of federal law. Furthermore, Fisher failed to tell Graham at the time of the "bargain" that his hypothetical purchaser was, as Fisher himself was, on federal parole. When the Government's promise of confidentiality is based on fraudulent or misleading premises supplied or left in place by the defendant, the Government does not violate the defendant's Fifth Amendment rights by disregarding the promise. *See People v. Selikoff,* 35 N.Y.2d 227, 238, 318 N.E.2d 784, 791, 360 N.Y.S.2d 623, 633 (1974) (in plea bargaining context, "if contract law were applicable, the negotiations would probably not have produced a binding agreement, either for fraud in the inducement or for unilateral mistake knowingly suffered to occur by defendant"), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975); *United States ex rel. Selikoff v. Commissioner of Correction,* 524 F.2d 650 (2d Cir.1975) (same case on federal habeas corpus), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *cf. Shotwell Manufacturing Co.,* 371 U.S. at 352, 83 S.Ct. at 455 (though no element of coercion present, defendants no longer entitled to rely on immunity when "petitioners attempted to hoodwink the Government"); *United States v. Tramunti,* 500 F.2d 1334, 1344–45 (2d Cir.) (witness forfeits immunity when he tries to thwart subsequent inquiry by evasion or falsehood), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *see generally,* Westen & Westin, A Constitutional Law of Remedies for Broken Plea Bargains, 66 Calif.L.Rev. 471, 529–38

(1978) (application of contract rules, standards, and remedies to prosecution bargains with defendants).

Judgment affirmed.