**UNITED STATES of America,**

v.

**Pedro Mateo MORA, Defendant.**

**No. 98 CR, 1407(MBM).**

United States District Court,
S.D. New York.

May 30, 2000.

Lauriano Guzman, Guzman & Velez, Bronx, NY, for Defendant.

Mary Jo White, U.S. Atty., Southern District of New York, Jennifer L. Borum, Asst. U.S. Atty., New York City, for U.S.

## OPINION AND ORDER

MUKASEY, District Judge.

On October 12, 1998, defendant Pedro Mateo Mora was arrested with a kilogram of cocaine tucked under his jacket. He is charged with possessing that kilogram with the intent to distribute it. He has moved to suppress both the drugs and incriminating statements he made following his arrest, on the ground that the arresting officer lacked cause to initiate the confrontation that led to discovery and seizure of the drugs, and did not warn Mora of his rights before he made the statements. As set forth below, Mora's arrest was lawful, albeit not for the reasons initially pressed by the government and testified to by the arresting officer, and the motion to suppress the drugs therefore is denied.

However, also as set forth below, the circumstances surrounding the arrest convince me that Mora was not warned of his rights before he made incriminating statements, and those statements were not otherwise voluntary. Accordingly, the motion to suppress those statements is granted.

## I.

### A.  *Plain View*

The initial charging instrument in this case was a complaint sworn to by the arresting officer, Detective Armando Rodriguez.  He averred in pertinent part that while on surveillance on October 12, 1998, he had seen defendant Mora leave the vicinity of 4841 Broadway in a van, and then return about 15 minutes later, get out of the van, and reach into the rear of the vehicle on the passenger side.  Mora then allegedly walked away from the van and "kept his right arm clutched to his body as he walked." (Cmplt.¶ 2) Then, according to the detective's account, he followed Mora to the entrance of 4841 Broadway and stopped him; when the defendant turned around, Rodriguez showed his badge and was rewarded with the following sight:

> At that time, I observed inside MORA's open jacket a yellow brick-like package which was tucked under his right arm. I then placed MORA under arrest.

(*Id.* ¶ 3) The complaint states that following the arrest, Rodriguez advised Mora of his *Miranda* rights and field tested the contents of the package for cocaine, with positive results.  (*Id.* ¶ 4, 5)

The evidentiary hearing on Mora's motion was generated by defendant's undated affidavit averring in part as follows:

> On October 12, 1998, I was stopped in the vicinity of 4841 Broadway, New York, New York. The police approached me, stopped me, and then searched me. The police recovered cocaine hidden inside my zippered jacket. I was then placed under arrest. At no time was I read my Miranda rights.

(Mora Affidavit ¶ 2) Mora also adopted his attorney's affidavit (*Id.* ¶ 3), which was at once more expansive and more argumentative, and which included the following:

> It is defendant Mora's contention that on October 12, 1998, the cocaine he was carrying was concealed on his person by a zippered jacket and that at no [ ] time

were the *drugs* in plain view.  There was no bulge or tell tale sign that Mora possessed drugs on his person.  It was only after detective Rodriguez unzippered Mora's jacket and removed the package that he knew Mora carried cocaine.

(Guzman Aff. ¶ 9)

The evidence relating to Mora's suppression motion was heard on six separate hearing days sprawled over a period of more than nine months.  The first three hearing days—August 10, August 25 and September 1, 1999—were taken up principally with the government's initial plainview theory of the case, presented mainly through the testimony of Rodriguez.  By letter dated August 6, 1999, the government moved *in limine* to bar defense counsel from cross-examining Rodriguez about findings by two state court judges, one in 1989 and one in 1995, that Rodriguez had testified to things he could not have seen or that were so unlikely as to warrant rejection of his testimony on its face, including one instance when a defendant allegedly exposed drugs to his plain view.  (8/6/99 Letter of Jennifer L. Borum Esq. to the Court, enclosing rulings in *People v. Ulerio,* No. 2453/92 Feb. 9, 1995 (Supreme Court, Bronx County), and *People v. Hernandez,* No. 1206/88, May 17, 1988 (Supreme Court, Bronx County)).  However, before the August 10 hearing got underway, defense counsel disclaimed any intention of examining the officer about those state cases.  (8/10/99 Tr. 2) As it later turned out, he would have no need to pursue any such examination; Rodriguez's account would fall of its own weight.

On August 10, Rodriguez testified that the occasion of Mora's arrest on October 12, 1998 was not the first time he had seen Mora. On March 25, 1998, while conducting a then unrelated surveillance on upper Broadway, members of Rodriguez's team saw a silver van that they had been watching for weeks, whose occupants and operators were suspected of trafficking in nar-

cotics, park behind Mora's tan van at 259th Street and Post Road in the Bronx, and saw two men emerge and give a duffel bag to Mora and another occupant of the tan van. Mora and that other person then drove to the vicinity of Academy Street and Broadway, where Mora was seen to carry the bag from the van into 4841 Broadway. Mora then emerged, empty-handed, and got back into the tan van. (8/10/99 Tr. 7–8) Rodriguez testified that at that point he and a uniformed officer approached Mora's van "and identified Mr. Mora and the second individual that was seated in that van" (8/10/99 Tr. 8), which apparently meant that Rodriguez and the uniformed officer had stopped and obtained identification from both men. *See, e.g.,* 8/25/99 Tr. 5, 6 (describing "stop" rather than mere observation). Rodriguez participated in the March 25 events, and saw a report describing them. (8/10/99 Tr. 7–8; 9/1/99 Tr. 14–19)

Rodriguez later learned that five persons connected with the events of March 25, not including Mora, had been arrested for drug trafficking, that there had been one or more guilty pleas, and that intelligence from that case showed that the duffel bag Mora had carried into 4841 Broadway had contained 15 kilograms of cocaine. (8/10/99 Tr. 31–32)

It was with awareness of those facts that Rodriguez saw Mora again on October 12, 1998, once again while he was on an assignment that did not relate directly to Mora. (8/10/99 Tr. 7) The officer said he saw Mora get into the same tan van he had seen Mora use on March 25, as it stood parked on Broadway. Mora sat in the van for a few minutes, drove off, and then returned in about 15 minutes and parked in the same spot. (8/10/99 Tr. 8–9) Rodriguez testified that he was across the street, facing the driver's side of the van; and saw Mora get out of the van and go to the passenger side of the vehicle. According to Rodriguez, he could see, through the rear window on the driver's side, that Mora opened the rear door on the passen-

ger side and bent down, appearing to lean into the vehicle. (8/10/99 Tr. 8–9; 8/25/99 Tr. 8–10) Rodriguez testified that he then saw Mora "crossing the intersection and his right arm was clutched to his body very tightly to his body as he was walking," and that Mora then entered 4841 Broadway; the officer followed close behind. (8/10/99 Tr. 9)

Rodriguez testified that he then caught up with Mora and said "Police, stop." (8/10/99 Tr. 10) Rodriguez was wearing his shield around his neck but had not drawn his gun. (*Id.*) Rodriguez testified initially that the reason he confronted Mora was that he wished to verify Mora's identity and address (8/10/99 Tr. 21), and later testified that his reason for stopping Mora was "obvious." He amplified that as follows:

Q. And the obvious reason that you were stopping him was?

A. Well, number one, I wanted to find out his identity and if he was still living there, and, number two, the suspicious activity that had just occurred.

(8/10/99 Tr. 28) Rodriguez explained that "suspicious activity" referred to the coincidence of the same person observed in March, driving the same van, who later walked across the street with "his arm, his right arm, clutched to his body as if he's concealing something." (8/10/99 Tr. 29–30) Rodriguez continued further:

A. So at that point in time, when he's walking across, we decided to stop and approach him. And I said—basically, I was going to verify to see if in fact, number one, it is the same guy with the same identity and, number two, if he's still living at the same location.

Q. Also, you wanted to know whether he was concealing something, correct?

A. No, just it was just suspicious, it was strange.

(8/10/99 Tr. 30)

According to Rodriguez:

Mr. Mora then turned around quickly, and as he turned around facing me, I

could observe under his right arm inside his jacket he had a yellow brick package which I identified to be a kilogram of cocaine.

(*Id.*) Rodriguez testified that he could see the package because Mora was wearing a waist-length jacket with the zipper open. (8/10/99 Tr. 12) Rodriguez could not recall what type of jacket Mora was wearing, other than that it was waist length (8/10/99 Tr. 23), and specifically denied that he himself had unzipped the jacket. (8/10/99 Tr. 26) He testified that the defendant's arms were at his side when he told the defendant to turn around. (8/10/99 Tr. 23)

Notably, Rodriguez testified that when he stopped Mora he had no fear for his safety. "There was no threat, so I didn't have a gun out to assess that threat, to deal with that." (8/10/99 Tr. 19)

The officer testified that he retrieved the package from under Mora's arm, immediately recognized it to be a kilogram of cocaine, and walked him further into the hallway of the building, where he read Mora his *Miranda* rights from a card. (8/10/99 Tr. 10–11) Mora was then in fact under arrest, although according to Rodriguez what occurred was that "[w]e then proceeded to Mr. Mora's apartment ... one flight up from the lobby." (8/10/99 Tr. 11) Mora then allegedly told the officer "that he had just obtained this kilogram of cocaine from an individual for $18,000, and that he was about to sell it to someone for $19,000. When asked if [he] could identify or obtain more drugs from this individual, he stated that he could and that in the past he had done this numerous times." (*Id.*)

During a colloquy at the August 10 hearing, the government disclosed that Rodriguez had given grand jury testimony in the case relating to the five participants in the March 25 events, and the hearing was adjourned so that his prior statements in that case could be produced as 3500 material in connection with the hearing. (*Id.* at 33–35)

At the resumed hearing on August 25, Rodriguez was not questioned further about the events of March 25, but was questioned about the October 12 arrest. He reiterated that Mora's waist-length jacket had been unzipped (8/25/99 Tr. 3, 4, 5), and claimed he could see the entire length of the package tucked under Mora's right arm when defendant turned around. (*Id.* at 5) Again, he could not recall of what material the jacket was made. (*Id.*)

Mora testified at the resumed hearing as well. He denied having been stopped in March 1998. (8/25/99 Tr. 31) With respect to the encounter that led to his October 12 arrest, he testified that he had called one Julio Gori from his apartment at 4841 Broadway, and the two agreed that Gori would provide him with a kilogram of drugs later that day. (8/25/99 Tr. 14) Mora said he then put on a leather jacket and conducted an experiment to determine whether he could conceal inside it a parcel of the approximate size of a kilogram of drugs:

I zipped it up part way and I put in a book that I had at home to see, since I was going to get a kilo of drugs, to see if it was comfortable because I didn't want to be uncomfortable. I stood in front of the mirror and I walked, I moved around, I jumped, and I saw that it didn't bother me at all.

(8/25/99 Tr. 15) Mora later made it explicit that the book had not fallen out. (8/25/99 Tr. 24) Mora replicated that experiment, and more, in court while wearing the jacket he claims he wore on October 12, a leather jacket with an elasticized or shirred waist. (Ex. B) In place of the book he had used in his apartment, and of the package of drugs, Mora used my bench copy of West's Federal Criminal Code and Rules. Although Mora testified that the package of drugs he ultimately concealed under his jacket was smaller than the book I provided, when the West volume was tucked under his upper arm inside the jacket it could not be seen even with the jacket unzipped. (8/25/99 Tr. 20–21) Fur-

ther, when the book was placed inside the jacket and the jacket was zipped, the jacket supported the book inside even when Mora extended his arm. (8/25/99 Tr. 21) The West volume weighs 3 pounds 14 ounces, which is more than a pound heavier than a kilogram.

Mora testified that near the appointed hour for his rendezvous with Gori, he got into the tan van and, after assuring that he was not being followed, drove several blocks to the prearranged meeting spot. As Mora described it, Gori got in, and placed the kilogram between the front seats under a cushion; Mora drove the van a half block further away, where Gori got out. Mora testified that he then placed the kilogram inside his jacket and zipped up the jacket to just below his sternum. (8/25/99 Tr. 15–16) He then returned to the location from which he had started, found the same parking spot, and crossed the street to enter the building where he lived. (8/25/99 Tr. 16–17)

According to Mora, as he entered the building, Rodriguez approached him from the rear, pushed him so that Mora's hands were up against a wall and one of the officer's hands was on the back of Mora's head. (8/25/99 Tr. 17, 28–29) Mora testified that with the other hand Rodriguez patted him down and apparently felt the kilogram package. (8/25/99 Tr. 17, 28, 29) As Mora described it, the officer then turned Mora around, unzipped the jacket, removed the package from under his right arm (*id.*), and told Mora that "you're going to get ten years of prison for this. But if you cooperate with me, I can talk to someone and have it reduced to one year of jail." (8/25/99 Tr. 17) Mora testified to this last statement as part of a long narrative in response to a general question, "Then what happened?"—asked by his lawyer following Mora's description of having placed the kilogram of cocaine inside his jacket. (8/25/99 Tr. 16) Mora said that they then went to his apartment where, at the behest of the officer, he made two calls to his supplier, Gori. (*Id.* at 22–23) Mora

denied that Rodriguez advised him of his *Miranda* rights until hours later at the station house. (*Id.* at 17–18)

At the close of the August 25 hearing, an issue emerged as to just how much of the events of March 25, 1998 Rodriguez had actually seen or become aware of by October 12, the date of the arrest. Accordingly, the hearing reconvened yet again on September 1, when the officer who wrote the report about the March 25 incident, Salvatore Palumbo, testified and authenticated his report. (9/1/99 Tr. 2–12) After a brief further delay, Rodriguez testified to what he had actually seen on March 25, which did not include Mora taking the bag into 4841 Broadway; however, he testified also to having seen the report before October 12. (*Id.* at 14–19)

In its initial post-hearing submission, the government argued that in view of what Rodriguez was aware of from his own observations and Palumbo's report, when he saw Mora apparently clutching something under his jacket on October 12, Rodriguez had at least reasonable suspicion that a criminal act had occurred or was about to occur, justifying an investigative approach to Mora. *See United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995), and cases cited therein. This reasonable suspicion ripened into probable cause, the government argued, when Mora turned around in response to Rodriguez's call to him, and the package under Mora's arm, recognizable as a brick of cocaine, was open to Rodriguez's plain view. (Gov't. Oct. 1, 1999 Mem. at 8–9)

B. *Probable Cause To Arrest Before the October 12 Stop*

On November 30, 1999, after I had reviewed the post-hearing submissions, I solicited briefing on an issue that had not been squarely addressed by the parties: whether Rodriguez had probable cause to arrest Mora even before he approached him on October 12. I told the parties also that the need for further briefing arose because, for reasons I did not then explain

but will below, it was clear to me that events on October 12 had not occurred as testified to by Rodriguez, and that if the government's only theory was the one it had argued in its post-hearing brief—the ripening of reasonable suspicion into probable cause when Rodriguez saw the kilo of cocaine in plain view under Mora's arm— the motion to suppress would be granted. (11/30/99 Tr. 2)

My request for further briefing generated requests, initially from the government but eventually from both sides, to reopen the hearing for additional testimony. Such additional testimony was taken on February 2 and 23, 2000.

On February 2, the government presented the testimony of Rufino de la Cruz Reyes,[1] one of the convicted drug traffickers who allegedly had provided the 15 kilograms of cocaine claimed to have been in the bag that Mora was seen carrying into 4841 Broadway on March 25, 1998. De la Cruz testified that on March 24 he had received a shipment of 227 kilograms of cocaine from the Dominican Republic, of which 212 kilograms was for him and the remaining 15 was for someone who, according to the supplier, would call him. (2/2/00 Tr. 7) In due course, apparently the next day although that was not made explicit, de la Cruz received the expected telephone call and arranged to meet the person who had called at the behest of the supplier. That person then arranged to meet him later to arrange for the delivery of the drugs. At the appointed hour for that meeting, de la Cruz and two others who would eventually become codefendants in the five-defendant case earlier alluded to by Rodriguez—Hector Rojas and Jesus Alvarado—arrived at the appointed spot, and met with two men in a cream or beige colored van. (2/2/00 Tr. 7–9)

During that meeting, de la Cruz instructed Rojas to deliver 15 kilograms to the two men. Rojas was to get the drugs from an apartment de la Cruz maintained at 259th Street and Tyndall Avenue. (*Id.* at 9–10) De la Cruz testified that Rojas drove a gray van (*id.* at 26), and that Rojas called him later that afternoon to report that he had delivered the drugs. (*Id.* at 9) De la Cruz was arrested on March 30, 1998. (*Id.* at 6) By August 1998, he had disclosed the details of the 15–kilogram transaction to Rodriguez. (GX 3503B; 2/2/00 Tr. 12, 13) According to de la Cruz, he identified Mora, from a photograph that was shown to him following his arrest, as one of the people in the van with whom he had met on March 25. (2/2/00 Tr. 33)

Defense counsel sought to pin down de la Cruz as to the time when he had met with Mora on March 25 and the time when the drugs had been delivered. Although he got de la Cruz to state that the initial meeting with the men in the tan van had occurred at about 4:00 p.m. (*id.* at 19) and that the drugs had been delivered about a half hour later (*id.* at 21–22), I do not place great weight on those estimates of time almost two years after the event. In any event, it was plain and explicit that de la Cruz's estimates of time were just that— estimates. (*Id.* at 28, 31)

Mora offered more of his own testimony, and that of his friend Roberto Sanchez and his companion of 12 years, Bienvenida Ayvar, in an effort to show that he was not and could not have been meeting with de la Cruz and his cohorts on March 25 because at the relevant times he was either on his way back from work, or in the company of Sanchez waiting to leave for the airport to meet Ayvar and their children who were returning from Santo Domingo. Thus, Mora introduced a copy of his time card to show that he had punched out at 3:40 p.m. from his place of employment in Bayonne, New Jersey. (DX R; 2/2/00 Tr. 45, 48) He testified that he arrived in the vicinity of his home at about 4:30 p.m.

---

1. Rodriguez was unavailable that day, but would testify at the final evidentiary hearing on February 23.

and met by prearrangement with Rojas outside his apartment building at 204th Street and Broadway. Rojas, he testified, had agreed to accompany him to Kennedy Airport to pick up his wife and children. (2/2/00 Tr. 48–49) They left his apartment at about 5:30 and had to return briefly because Mora had forgotten to take jackets for his family members to wear after they landed following their flight from the Dominican Republic. (*Id.* at 49–50) According to Mora, it was while he was in his apartment retrieving the jackets that Rodriguez and a uniformed officer approached his van, and he testified that he encountered them when he emerged from his apartment building carrying the jackets. (*Id.* at 50–51) He testified that he and Rojas arrived at the airport at about 6:35 p.m. (*Id.* at 51) Sanchez testified essentially to the same effect (*id.* at 34–44), although his testimony about the encounter with Rodriguez and the uniformed officer included testimony that the police had searched the inside the van, and the following:

> So as he [Mora] was coming over with the coats, he thought they were giving me a ticket. So when he saw that they were searching inside the van, he said they were looking for something else.

(*Id.* at 37) He did not ask Mora what he meant by "something else." (*Id.* at 44)

Mora testified that the trip to the airport from his home took between 50 minutes and something over an hour, depending on traffic conditions. (*Id.* at 58) He said he had asked Rojas to meet him at 4:30 so they would have time to talk before they left for the airport. (*Id.*) Ayvar simply corroborated Mora's testimony that she had indeed arrived from Santo Domingo on March 25 with their son, and that she had seen Mora at the airport at some time after 6:00 and before 7:00 p.m. (*Id.* at 59–61)

On February 23, Rodriguez resumed the stand to testify further to the events of March 25, 1998 that he had been aware of at the time he approached Mora on Octo-

ber 12, including conversations with de la Cruz following the latter's arrest on March 30. He testified that he had been aware of the surveillance of the meeting at 259th Street and Post Road between Mora, traveling in his tan van, and the occupants of a silver van that had been identified as a vehicle used by a group suspected of narcotics trafficking (see pp. 3–4, *supra*), and of the continued surveillance of Mora's van until it arrived in the vicinity of Mora's apartment building, 4841 Broadway. When Rodriguez arrived at that location, he was told that Mora had left his van and entered 4841 Broadway carrying a black bag. One man remained in the passenger seat of the double-parked van. (2/23/00 Tr. 3–4)

Rodriguez testified that he then saw Mora emerge from 4841 Broadway, reenter the van, and drive to the Bronx, where he picked up a third man and then returned to the vicinity of 4841 Broadway, where he parked. Mora and the man he had picked up in the Bronx then entered 4841 Broadway, leaving one person in the passenger seat. According to Rodriguez, he asked a uniformed officer on the scene to assist him in identifying the occupants of the van once the driver returned to it. Soon afterward, Mora again emerged from 4841 Broadway and got into the van, at which point Rodriguez and the uniformed officer approached the van and asked to see the driver's license, the vehicle's registration and insurance card, and apparently the passenger's identification as well. (*Id.* at 4–6)

Rodriguez said the driver, Mora, told him that he and his passenger were on their way to Kennedy Airport to pick up Mora's family who were returning from the Dominican Republic, and pointed out jackets in the van that presumably were for his family. (*Id.* at 6)

The officer testified also to having participated in the March 30 arrest of de la Cruz and others. According to Rodriguez, following the arrest de la Cruz told him

474

that he had received 227 kilograms of cocaine on March 24, that 212 were for him and that he was to deliver 15 to a person who could be contacted through a particular pager number. Rodriguez testified that de la Cruz told him that he had instructed two of his colleagues, Rojas and Alvarado, to contact the pager number, set up a meeting, and deliver the 15 kilograms. Rojas then told de la Cruz some time later that he had made the delivery of the 15 kilograms. (*Id.* at 8–9) Rodriguez's version of the showing of photographs (see p. 13, *supra*) was that he had shown de la Cruz several photographs, including a photograph of Mora, but that de la Cruz had failed to identify any of them. Rodriguez then told de la Cruz that one of the photographs depicted the recipient of the 15 kilograms. (2/23/00 Tr. 10)

In the submissions that followed the February 23 hearing, the government included affidavits from two detectives who had been with Rodriguez when he saw Mora leave the van and cross the street just before his arrest on October 12, 1998—Detectives William C. Hale and Raymond Connor. These affidavits confirmed that after leaving the van, Mora had clutched his side as if holding something under his jacket. (Hale Aff. ¶ 8; Connor Aff. ¶ 7) Not surprisingly, defense counsel objected to my considering the substance of the affidavits unless he had the opportunity to cross-examine the affiants. Accordingly, on May 15, 2000, the sixth and final hearing was held, at which Hale and Connor testified and confirmed the substance of their affidavits—*i.e.*, that Mora had been holding his side when he left the van and crossed the street on October 12. (5/15/00 Tr. 7, 17) Neither detective had seen Rodriguez confront Mora; both approached after Rodriguez already was holding the kilogram of cocaine he had removed from under Mora's jacket. (*Id.* at 9, 19)

However, it was plain from the testimony of each of the two detectives that what appears to have generated law enforcement interest in Mora on October 12 was a desire to find out what was under his jacket, not—as Rodriguez testified—to confirm his identity or his address. Both Hale and Connor testified that they had been eating lunch with Rodriguez and a sergeant, Diane Contreras, at a restaurant that looked out on Broadway, just before Mora was arrested. The officers were in the neighborhood to gather intelligence in various cases, and not in particular to observe Mora or anyone known to be connected to him. (*Id.* at 6, 12, 20) Hale was present when Rodriguez first saw Mora's van parked across Broadway from the restaurant, and Hale went outside to see the license plate number. Contreras confirmed based on her notes that the van was the same one Rodriguez had seen earlier. As Mora drove off in the van, Rodriguez told his fellow officers that he had heard from an informant that a large amount of cocaine had been carried in that van. (*Id.* at 16) The officers then saw Mora return, park again across the street, go to a door on the passenger side, and cross the street clutching something under the waist-length jacket he was wearing. (*Id.* at 5–7, 16–17) According to both detectives, when the law enforcement officers at the table saw Mora apparently holding something under his jacket, they looked at one another, got up, and headed for the door of the restaurant. (*Id.* at 7, 17) Each detective testified that what he was interested in doing was finding out what Mora had under his jacket, although no one said so explicitly. (*Id.* at 7, 11–12, 17, 21–22)

Neither Hale nor Connor saw Rodriguez confront Mora because Hale realized as he was about to leave the restaurant that he had left the pouch containing his weapon on the table, and returned to get it (*id.* at 7), and Connor similarly returned to retrieve his briefcase (*id.* at 17–18).

II.

The reason the government's initial version of the events of October 12—that Rodriguez saw the drugs in plain view

under Mora's arm inside his unzipped jacket when Mora turned to face him in front of 4841 Broadway—cannot justify the seizure in this case is that it is plainly not true. If, as Rodriguez testified, Mora's jacket was unzipped when he turned to face the officer, then Mora's arm would have had to have remained "clutched" (8/10/99 Tr. 29–30) against his body or the kilogram of cocaine would have fallen to the ground. However, if Mora's arm was "clutched" against his body, the front of his jacket on the side where the cocaine was lodged would have continued to conceal the kilogram under his arm even if the jacket was unzipped and Mora had pirouetted like a ballet dancer when he turned to face the officer. On the other hand, if the jacket was zipped, then the front of the jacket would have continued to conceal the cocaine under Mora's arm even if his arm was not "clutched" against his body.

Another clue to the falsity of Rodriguez's account of how he came to discover the kilogram of cocaine under Mora's arm may be found in his response, on cross-examination, to the question of whether, when he saw Mora crossing the street with his arm "clutched" to his side as if concealing something under his jacket, he was interested in finding out what Mora had under his jacket. Rodriguez testified initially that the reason he confronted Mora was that he wished to verify Mora's identity and address (8/10/99 Tr. 21), and later testified that his reason for stopping Mora was "obvious." He was then asked to explain further:

Q. And the obvious reason that you were stopping him was?

A. Well, number one, I wanted to find out his identity and if he was still living there, and, number two, the suspicious activity that had just occurred.

(8/10/99 Tr. 28) Rodriguez explained that "suspicious activity" referred to the coincidence of the same person observed in March, driving the same van, who later walked across the street with "his arm, his right arm, clutched to his body as if he's concealing something." (8/10/99 Tr. 29–30) Rodriguez continued further:

A. So at that point in time, when he's walking across, we decided to stop and approach him. And I said—basically, I was going to verify to see if in fact, number one, it is the same guy with the same identity and, number two, if he's still living at the same location.

Q. Also, you wanted to know whether he was concealing something, correct?

A. No, just it was just suspicious, it was strange.

(8/10/99 Tr. 30)

Recall that on October 12, 1998, Rodriguez had reason to believe that Mora had carried 15 kilograms of cocaine into 4841 Broadway in March. Here was the same man with his arm "clutched" against his side, as if hiding something under his jacket. It beggars belief that Rodriguez was not thinking about what Mora might have under his jacket, that curiosity about that subject played no part in the stop, and that Rodriguez wanted simply to verify Mora's identity and address. Both detectives who testified at the May 15 hearing, Hale and Connor, said that curiosity about what was under Mora's jacket was what made each of them leave the restaurant to participate in confronting Mora. (5/15/00 Tr.at 7, 11–12, 17, 21–22) Indeed, Hale was so eager that he ran out of the restaurant without his weapon; similarly, Connor forgot his briefcase. (*Id.* at 7, 17–18) It is if anything even plainer that that is what motivated Rodriguez to approach Mora, and I so find.

Although it is not directly relevant to the disposition in this case, I find it impossible for at least two reasons to credit completely Mora's testimony, particularly his denial that his arm was pressed or "clutched" to his side, and his insistence that he relied on the jacket to support the weight of the kilogram of cocaine based on the experiment he had conducted in his apartment to see whether the jacket would

support a book. See p. 8, *supra*. First, Mora was carrying a highly valuable and incriminating parcel, and knew it; otherwise, there would have been no point in his experiment with the book.[2] It seems to me far more likely than not that despite the experiment confirming that his jacket would sustain the weight of a book, Mora would keep a firm grip on the package even involuntarily, so as to prevent it from slipping out or moving around as he walked.

Second, Mora's claim that he was not clutching the package under his jacket proves too much. If in fact Mora was simply walking casually across the street, without pressing or clutching his arm to his side, there was no reason for Rodriguez to stop him. Rodriguez and his fellow officers had already seen Mora drive off in the tan van, and had not approached him. One would have to credit Rodriguez and his fellow officers with extra-sensory powers to conclude that they left the restaurant to confront Mora when he returned in the van, and that Rodriguez then frisked him, based on nothing other than seeing Mora walk across the street without doing anything to suggest that he was concealing something under his jacket.

I conclude that Mora in fact was pressing or clutching his arm against his side, and that that was the reason Rodriguez approached him and eventually reached inside his jacket.

### III.

■ As noted above, Rodriguez's version of how he came to discover the kilogram of cocaine inside Mora's jacket was plainly false. Therefore, the search and subsequent seizure cannot be justified based on the cocaine having been in plain view following a lawful stop by a police

officer. Moreover, if Rodriguez patted Mora, or reached inside his jacket without patting him first, that conduct cannot be justified as a permissible frisk following a permissible stop, even if the sight of Mora concealing something under his jacket could justify such a stop. Under a doctrine stemming from *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer who has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' " is justified in stopping the subject of that suspicion and conducting a further investigation. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868) What justifies a frisk following such a stop are facts from which "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Here, however, Rodriguez conceded explicitly that he had no reason to fear for his safety when he approached Mora. *See* p. 6, *supra*. Therefore, by Rodriguez's own admission, he had no justification of the sort carved out in *Terry* for conducting a search for weapons, the only kind of search that is permissible in connection with a stop that is not pursuant to an arrest based on probable cause.

■ From the above conclusions, it appears that the search of Mora's person in this case, and the subsequent seizure of the cocaine, was justified only if Rodriguez had probable cause to make an arrest when he approached Mora on October 12, and therefore to conduct a search of Mora's person incident to that arrest. Based on Rodriguez's own observations on March 25, his conversations with fellow officers, his perusal of a report describing the events of March 25, and his conversa-

---

**2.** Depending on its purity, the kilogram of cocaine likely was worth upwards of $16,000. *See, e.g., United States v. Desimone*, 119 F.3d 217, 222 (2d Cir.1997) ($16,500—$17,000). *See also United States v. Martinez*, 151 F.3d 384, 388 (5th Cir.1998) ($16,500); *United*

States v. Romero*, 150 F.3d 821, 823 (8th Cir. 1998) ($22,000–$28,000); *United States v. Moore*, 149 F.3d 773, 777 (8th Cir.1998) ($36,000); *United States v. Iaconetti*, 59 F.Supp.2d 139, 143 (D.Mass.1999) ($16,500).

tions with de la Cruz, a cooperating defendant who was in custody, Rodriguez was aware on October 12 of the following facts: On March 25, Mora and another person drove in his van and met with occupants of a silver van who had been under surveillance and had been suspected of narcotics trafficking. At that time, Mora obtained from them a duffel bag, which he transported to his apartment building at 4841 Broadway and carried inside.[3] Five persons connected with that March 25 meeting were arrested, and one or more pleaded guilty to drug charges. One of those arrested, de la Cruz, disclosed that the bag Mora had obtained and carried into his apartment building contained 15 kilograms of cocaine. *See* pp. 3–4, *supra.*

■ If one bears in mind that probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts[,]" *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), requiring only sufficient information "to justify a person of reasonable caution in believing that an offense has been or is being committed[,]" *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990), by a particular person, and that the requirement of probable cause "does not demand any showing that such a belief be correct or more likely true than false[,]" *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), then it follows that the facts set forth in the preceding paragraph were more than enough to establish probable cause to believe that Mora had committed a crime on March 25. *See, e.g., Patrick,* 899 F.2d at 172 (probable cause to arrest man who accompanied woman found at border in possession of cocaine when both told same unlikely story

about how they came to be there). Such cause justified Mora's arrest on sight. *See, e.g., United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987) (warrantless arrest justified if probable cause exists at the time it is made).

■ In determining that there was probable cause to justify Mora's arrest before Rodriguez confronted him on October 12, I need not concern myself with Rodriguez's apparent disclaimer of any intent to arrest Mora at that time. Probable cause is an objective standard and does not depend on the thoughts or motives of the law enforcement officer making a stop or arrest. *See Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The important thing is that Rodriguez had probable cause to arrest Mora, not whether he intended to act on it.

Because Rodriguez had probable cause to arrest Mora even before he discovered the cocaine Mora was carrying under his jacket on October 12, Mora's motion to suppress that cocaine must be denied.

## IV.

■ There remains the issue of Mora's post-arrest statements. As noted, Mora testified that he was not advised of his *Miranda* rights; Rodriguez testified that he was. *See* pp. 7,10, *supra.*

Even further, Mora testified that after the officer detected the kilogram of cocaine under Mora's jacket and removed it (8/25/99 Tr. 17, 28, 29), he told Mora that "you're going to get ten years of prison for this. But if you cooperate with me, I can talk to someone and have it reduced to one year of jail." (8/25/99 Tr. 17) Mora testi-

---

**3.** I realize that to the extent my finding of what Rodriguez knew on October 12 concerns Mora's activities on March 25, I am rejecting *sub silentio* Mora's evidence that he could not have been observed on that date because he was at work or in transit from work. *See* pp. 13–14, *supra.* There seem to me several reasons to reject that evidence, including that accepting it would require me to believe that New York Drug Enforcement Task Force agents fabricated reports on

March 30 and April 8, 1998, describing entirely fictitious activities on March 25 (*see* GX 3502B, C), in anticipation of Mora's arrest in October. I have no basis for such a belief. Another reason to reject at least the conclusion Mora proffers from his evidence is that the time estimates of the witnesses are not so firm that it would have been inconsistent for Mora both to have put in a day's work at his lawful job in New Jersey and to have attended to his unlawful duties later in New York.

fied that they then went to his apartment where, at the behest of the officer, he made two calls to his supplier, Gori. (*Id.* at 22–23) Rodriguez was never asked explicitly to affirm or deny having said that, although he did testify that after he arrested Mora in the lobby, "[w]e then proceeded to Mr. Mora's apartment ... one flight up from the lobby." (8/10/99 Tr. 11) It seems to me notable that, having arrested Mora in possession of a kilogram of drugs, Rodriguez did not take him straightaway to the precinct but that instead they "proceeded to Mr. Mora's apartment," where the calls to Gori were made. It seems obvious from this chain of events that immediately after the arrest, there was a discussion of cooperation, and Mora agreed to cooperate. The only issue is what was the content of the discussion. Again, I have only Mora's testimony on that issue, and I decline to prolong this matter still further so as to give the government yet another bite at the apple. Based on the content of his testimony thus far, I will assume *arguendo* that Rodriguez would deny having made to Mora the explicit representation that although Mora was facing ten years in prison, "if you cooperate with me, I can talk to someone and have it reduced to one year of jail." (8/25/99 Tr. 17) For the reasons set forth below, I believe that Mora's testimony, both as to the absence of *Miranda* warnings and as to Rodriguez's representation about what he could achieve if Mora cooperated, was accurate.

First, based on the facts I have already found, I think it is apparent that as soon as Rodriguez saw Mora crossing the street on October 12, holding his arm against his side, Rodriguez was intent on finding out what was under Mora's jacket, and proceeded to do so. From that, I conclude that once Rodriguez found the cocaine, he was intent on pressing his advantage as far as he could, not simply by arresting Mora but by getting him to cooperate. Giving *Miranda* warnings would have tended to impede that process by explaining to Mora a reason to wait until he obtained counsel. Certainly, whatever psychological advantage Rodriguez had over Mora in catching him, by surprise, in a highly incriminating predicament, could have been dissipated if Mora chose to wait before speaking further with Rodriguez. When one considers that Rodriguez was willing to testify to something that did not happen when he thought it was necessary to do so in order to justify his seizure of the cocaine, I see no reason why he would be unwilling to bypass *Miranda* warnings if they posed a risk to the advantage he had achieved over Mora, particularly when there were no witnesses other than him and Mora to whether the warnings were given. On this point, I credit Mora's testimony that no *Miranda* warnings were given before Mora made disclosures to Rodriguez and called Gori from his apartment.

Absent other facts, a finding that the warnings were not given might not necessarily result in suppression. There exists a statute which provides in pertinent part that, "a confession ... shall be admissible in evidence if it is voluntarily given," 18 U.S.C. § 3501(a) (1994), and lists certain factors that a court must take into account in making that determination, *see* 18 U.S.C. § 3501(b), including but not limited to whether a defendant had been advised of his right to remain silent, of the fact that his statements could be used against him, and of his right to counsel. That statute was enacted just two years after *Miranda* was decided, but the Supreme Court has not yet ruled on whether the warnings prescribed by *Miranda* are constitutionally mandated and, if not, whether that statute effectively overrules *Miranda.* The Court is expected to rule shortly on those issues, having granted certiorari and heard argument relating to a decision by the Court of Appeals for the Fourth Circuit, *United States v. Dickerson,* 166 F.3d 667 (4th Cir.1999), that the statute did overrule *Miranda. Id.* at 692.

The government in this case has declined as a matter of policy to rely on Section 3501, adhering to the position taken by the Solicitor General in *Dickerson* that *Miranda* is constitutionally based. (3/7/00 Letter of Jennifer L. Borum, Esq.

to the Court at pp. 1–2) However, if not literally in the same breath then at least in the same letter, the government reminds me, archly, that I am free to make my own independent assessment of the law and to rely on the statute if that assessment yields agreement with the result the Fourth Circuit reached in *Dickerson*. *Id.* at p. 2. So I am. Here, I agree with Justice Scalia that the statute duly enacted by Congress is just as much the law, assuming that it is constitutional, and therefore binds the court just as firmly, whether the government chooses to invoke it or not. *See Davis v. United States,* 512 U.S. 452, 463–65, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Scalia, J., concurring) As the government notes, I did rely once before on the statute at least in part, although the issue raised in that case concerned alleged denial of the Sixth Amendment right to counsel where *Miranda* warnings had been given. *United States v. Saleh,* No. S3 93 Cr. 181(MBM), 1994 WL 549538 (S.D.N.Y. Oct. 6, 1994).

Be all that as it may, even the statute, assuming again that it is constitutional, will not save Mora's post-arrest admissions if they were not voluntary. As noted above, Mora testified that Rodriguez told him he was facing ten years in prison as a result of having been caught in possession of the cocaine, but that if he cooperated Rodriguez could get the sentence reduced to a year. I credit that testimony for two reasons. First, it is consistent with Rodriguez's energetic thrust to obtain Mora's cooperation—recall that following the arrest Mora was taken not to the precinct but to his apartment to place a call to Gori. Second, at the time Mora gave that testimony neither party had addressed the issue of voluntariness apart from *Miranda* warnings. Mora had no reason to make up such a story unless he was aware of the issue from some source other than his lawyer, whose papers made no mention of the issue. Further, Mora described the statement at issue as part of a much longer narrative in response to the most general of questions—"Then what happened?"—that could not in any way have suggested

the issue. Based on Mora's demeanor and affect at the hearing, I do not believe he was aware of this issue, and therefore I do not believe that he made up his account of what Rodriguez said. Here I emphasize that it is not that Mora was credible across the board; I have already rejected his claim that he was not holding his arm at his side on October 12, *see* pp. 21–22, *supra,* and his attempt at an alibi for March 25, *see* p. ——, n. 3, *supra.* On this point, however, I credit his testimony.

Under these circumstances, Mora's post-arrest statements cannot be considered voluntary, whether they occurred as a part of active cooperation or simply in response to interrogation. Even in less stark circumstances, courts have found confessions involuntary when given in response to specific assurances of leniency. *See, e.g., Clanton v. Cooper,* 129 F.3d 1147, 1151, 1159 (10th Cir.1997) (misrepresentation of nature of evidence combined with promise of leniency elicited when subject was not under arrest); *United States v. Rogers,* 906 F.2d 189, 191 (5th Cir.1990) (promise by state law enforcement officials that defendant would not be arrested held to survive even *Miranda* warnings in subsequent interview with federal agents; confession involuntary). Here, Mora had just been placed under arrest, had not been warned of his *Miranda* rights, and was given a specific promise of leniency in return for cooperation.

In *United States v. Fisher,* 700 F.2d 780 (2d Cir.1983), Judge Oakes, writing for the Court, discussed long-standing Supreme Court precedent on the voluntariness of confessions, starting with *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897), where the Court quoted with approval the statement in a criminal law text of the period that a confession was involuntary and inadmissible if " 'obtained by any direct or implied promises, however slight.' " *Fisher,* 700 F.2d at 783. He pointed out that *Brady v. United States,* 397 U.S. 742, 753–55, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), had "refined the *Bram* principle" by holding that a guilty plea is not involuntary even if given in

order to avoid a more serious penalty that could be imposed after a trial, and noted that *Brady* had distinguished *Bram* "as dealing with 'a confession given by a defendant in custody, alone and unrepresented by counsel' in which case 'even a mild promise of leniency' might bar the confession." *Fisher,* 700 F.2d at 783 (quoting *Brady,* 397 U.S. at 754, 90 S.Ct. 1463).

In this case, Mora was alone, in custody and unrepresented by counsel, and the promise of leniency was not "mild"; it was strong and specific. Any resulting statement was involuntary and will be excluded.

\* \* \* \* \* \*

For the above reasons, Mora's motion to suppress the cocaine seized at the time of his arrest is denied, but his motion to suppress his post-arrest statements is granted.